SIDNEY H. DAWSON vs. THE TOWN OF ORANGE ET AL.

Third Judicial District, Bridgeport, April Term, 1905.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

Either party in a suit to quiet and settle the title to real estate, brought
    under General Statutes, §4053, has the right to a trial by jury of
    any issues of fact arising upon legal, as distinguished from equita-
    ble claims; and therefore nothing in the statute conflicts with the
    Constitution of this State or with that of the United States.
A claim may be "adverse" within the meaning of the statute, al-
  · though no attempt has been made to enforce it.    The mere asser-
    tion of a hostile claim is a sufficient injury to justify a suit.
The parties were at issue as to the ownership and possession of a nar-
    row strip of land between Long Island Sound on the south and the
    line of an old stone wall on the north.    The plaintiff produced a
    series of conveyances under which he claimed title, running con-
    secutively from 1846 to 1894.    The defendant's claim set up (1) own-
    nership and possession in the town of Orange ever since its incor-
    poration in 1822, and before then in New Haven ever since its
    formation; (2) title under a deed from one Wilmot given in 1846;
    (3) that the land had been reserved by New Haven in 1686 for a
    highway and had ever since been used as such; (4) that it had
    been used as a highway from time immemorial; (5) that it was a
    public beach; and (6) that from time immemorial it had been a
    town common.    The trial court of its own motion expunged the
    defenses of a highway and public beach; ruled that the defend-
    ant acquired no title to the land upon its incorporation; that the
    Wilmot deed did not relate to the strip in question; that the evi-
    dence of the defendant in respect to a town common was too weak
    to justify a judgment in its favor; and directed the jury to return
    a verdict for the plaintiff.    Held that the trial court, in the inter-
    est of simplicity, might properly have ordered a consolidation of
    several of the "defenses" in the answer which in substance were
    merely specifications of sources of title; and therefore committed
    no error in doing less and striking out a repetition of denials in a
    number of such defenses.                                    •
In his reply to the "defense" of a highway, the plaintiff alleged that
    such use of the land had been abandoned for more than one hun-
    dred years, and another highway substituted for it on other land
    of the plaintiff further north.    Held that a motion to strike out
    the allegation of the substitution and use of a new highway was. .
    properly denied, it being the right of the plaintiff, although not
    strictly necessary, to state his case thus plainly and fully.

Dawson *v.* Orange.

The defendant then demurred to this allegation, solely upon the ground that the abandonment of the use of the soil as a highway left it still a public beach. *Held* that this demurrer was properly overruled, since it did not question the sufficiency of the reply to meet the claim founded upon the existence of a highway, and did not properly raise the question of its sufficiency to meet the claim founded upon the existence of a public beach, the existence of which had been elsewhere denied in the reply.

An owner of the equity of redemption will be presumed, *prima facie*, to have been in possession of land when he conveyed his interest in it.

So long as such equity is unextinguished and the owner thereof retains possession, his acts done in connection with and affirmance of his possession—such as making a map of the premises and giving deeds based thereon—may be important evidence in determining to what limits it extended, if these are afterward called in question by those claiming adversely to the mortgagee.

But the mortgagor's naked declarations as to the boundaries of the land, made after the delivery of the mortgage, are not admissible to disparage the title of the mortgagee or of those claiming under or through him.

That a deed is not an ancient one does not preclude its proof by a certified copy from the land records, when the parties to it are not parties to the cause.

The defendant offered the testimony of certain old inhabitants living near the land in controversy and of several ex-selectmen, that they never heard of any claim of private ownership or any expression of doubt as to its being a public beach, until shortly before this suit. *Held* that this was properly excluded as too remote.

The only reputation which is admissible to prove that land was public property, or that there was a highway over it, is the reputation of a past generation.

What an old inhabitant, since deceased, said as to the rights of the public, is inadmissible unless it appears that the land of which he spoke is identical with or at least contiguous to the land in controversy; and this is equally true of any declarations or of documentary evidence.

The defendant sought to show that one of its selectmen had given permission to some one to camp on the land in question. *Held* that under the circumstances disclosed by the finding this was not admissible as an act accompanying and characterizing the town's possession, but at most a mere assertion of a right on the part of the town to control the occupation of the land, and was therefore properly excluded.

The declarations of a municipal officer are no more admissible to establish a municipal right than would be those of a private individual to establish a private right, against one adversely interested, when made in his absence.

VOL. LXXVIII—7

Dawson *v.* Orange.

Evidence was offered in defense of some statement or remark said to be in the nature of a declaration against interest, made by a mortgagee since deceased, under whom, through a foreclosure of the mortgage, the plaintiff derived his title. *Held* that if the statement was one of the character claimed it should have been admitted against the plaintiff as a privy in estate; but that its exclusion, under the circumstances shown in the record, constituted no sufficient ground for a new trial.

A witness for the defendant was asked what connection, if any, he had with the land in controversy at a certain time. *Held* that if he had any title, documentary proof should have been presented; and if he was the owner's agent, the inquiry was ill adapted to call his attention to that fact; and therefore there was no error in excluding the question.

A copy of a duly recorded certificate of foreclosure in statutory form is *prima facie* evidence, in favor of a third party claiming under it, that all rights inferior to the mortgage title were foreclosed.

A copy of the record of a town-meeting is the proper evidence to prove what proposition was submitted to it by certain landowners.

In determining whether the proposition submitted referred to the land in question or not, it must be interpreted in connection with the warning of the meeting.

A witness for the defendant was asked if Wilmot, to the knowledge of the witness, " had attempted to secure the ownership " from the town of the particular land in controversy. *Held* that the question was objectionable in form and properly excluded upon that ground.

Evidence that one parcel of land on the seashore had remained common property for two centuries does not give rise to a natural inference that another had also.

The land in controversy was part of a tract which had been allotted by the original proprietors in 1680 to one Trowbridge, in severalty. *Held* that a town vote of 1686 was admissible for the purpose of showing a dedication of the strip in question for highway purposes, but that it contained nothing which tended to prove that any part of Trowbridge's tract was thrown out or retained as a town common, as claimed by the defendant.

A town in this State is a mere governmental agent, and as such has no title to, lien upon, or right of property in, a town highway, nor in a public beach. The public, or the State, and not the town, are the parties interested, if the soil is claimed as the private property of an individual.

A public beach is one left by the State, or those claiming under it, open to the common use of the public, and which the unorganized public and each of its members have a right to use while it remains such.

The documentary and controlling evidence of the defendant in sup-

Dawson v. Orange.

port of its claims of title in fee and possession in its own right, and that it owned the land as a town common, reviewed, and the action of the trial judge, in refusing to permit the jury to pass upon it, sustained.

The action of a trial judge in directing a verdict because of the weakness or insufficiency of evidence, ought not to be reversed unless there are reasonably strong grounds on which error can be predicated.

Evidence of reputation, and of the declarations of aged persons since deceased, is admissible to show that the land in controversy is a town common; but from its inherent character it is of feeble force if inconsistent with a paper title established by the public records.

Two of the "defenses" alleged an estate in fee in the defendant through title derived upon its incorporation from the town of New Haven, and a similar estate in that town since its formation; but to one of them was added a claim of immemorial possession, and also of title by deed, neither of which were of any avail. *Held* that so far as the issues for the jury were concerned these defenses were identical.

Mere possession of land, however long continued, unless exclusive and adverse, is of no avail against one holding an established record title accompanied by evidence tending to show the latter's actual possession.

By replying to insufficient defenses a party waives his right to move to have them expunged, but the trial court is not thereby precluded from expunging them of its own motion.

While a mere claim of title is not subject to demurrer or denial, it is otherwise with the pleadings of either party which assert a title and specify its sources. Such pleading must be supported, if attacked, whether challenged because unsound in law or untrue in fact.

In the absence of any exception, a statement in the finding, to the effect that a fact therein recited was undisputed, must be accepted as conclusive on appeal.

Argued April 14th—decided June 20th, 1905.

ACTION to quiet and settle the title to land, brought to the Superior Court in New Haven County where a demurrer to the complaint was overruled (*Gager, J.*) and later one to the answer (*Thayer, J.*) and the cause was afterwards tried to the jury before *Gager, J.;* the trial judge directed the jury to return a verdict for the plaintiff, and from the judgment upon this verdict the defendants appealed. *No error.*

*Samuel C. Morehouse* and *Arnon A. Alling*, for the appellants (defendants).

*Talcott H. Russell*, for the appellee (plaintiff).

BALDWIN, J.    The statute under which this action was brought (Public Acts of 1893, p. 237, Chap. 66, General Statutes, §4053) authorizes any person claiming an interest in real estate to bring suit against any person or persons claiming an adverse interest in it, for the purpose of determining such adverse interest and to settle the title to the property.    Either party to such a proceeding has the right to a trial by jury of any issues of fact arising upon legal as distinguished from equitable claims.    *Miles* v. *Strong*, 68 Conn. 273, 286.    This being so, there is nothing in its provisions which is in conflict with the Constitution of the State or that of the United States.    It introduced, indeed, a novel mode of judicial procedure, but it was fully in the power of the General Assembly thus to enlarge our methods of remedial justice.    *Holden* v. *Hardy*, 169 U. S. 366, 385; *Holland* v. *Challen*, 110 id. 15.    Nor was the complaint insufficient in form.    A claim may be adverse, within the meaning of the statute, although no attempt has been made to enforce it. To set it up is treated as of itself a sufficient injury to justify a suit.    The demurrer to the complaint was there- . fore properly overruled.

The answer was divided into twelve separate " defenses. " The first denied the plaintiff's title to a certain portion of the land. described in his complaint, and also the alleged value of the entire tract.    In several of the others the first defense was made a part by reference, and substantially the same denials were also repeated.    The plaintiff moved that the denials be struck out of each of these, or that all the defenses should be consolidated.    The court might properly, in the interest of simplicity, since the so-called " defenses " were in substance specifications of sources of title, have ordered such a consolidation.    In doing less, by

Dawson v. Orange.

merely striking out the repetition of the denials, it committed no error.

It was alleged in the answer that the tract in controversy, which was a part of the main tract south of the line of an old stone wall and between that and the Sound, was a public beach, and from time immemorial, and certainly since 1686, had been laid out and used as a highway. To this the plaintiff replied that for more than a hundred years its use for a highway had been abandoned, and another highway substituted for it and used by the public, on his land north of the line of this wall. A motion to strike out so much of the reply as set up the substitution and use of the new highway was properly denied. These allegations tended to put the plaintiff's case more fully and plainly before the jury, and it was within his right, although not strictly necessary, to state it in that manner.

A demurrer next filed to this part of the reply was properly overruled. The only cause of demurrer assigned was that the abandonment of the use of the beach as a highway left it still a public beach. If so, the sufficiency of this part of the reply to meet the defense founded on the existence of a highway along the shore was not affected. Its sufficiency to meet the claim founded on the existence of a public beach was not properly put in question by this demurrer. That there was such a beach the reply elsewhere had denied.

A lengthy trial to the jury ensued. The following facts were undisputed: The land in controversy was part of an allotment made to Thomas Trowbridge, pursuant to an order of the town of New Haven, voted on December 29th, 1679, by which a committee was appointed to prepare a scheme for alloting to particular proprietors certain lands which up to that time had been held in common. These lands were situated in what is now the defendant town, and, on the report of the committee, it was further ordered, on December 20th, 1680, that the lots should be laid out beginning "at Mr. Malborn's Cove and So a long by y⁰ sea to Oyster river." The whole allotment to Thomas Trow-

bridge was 111½ acres. The land in controversy was a narrow strip bounded northerly by the line of an old stone wall which ran a short distance northerly of and substantially parallel with the ordinary high-water line of Long Island Sound. This strip is, at ordinary high tide, of a width varying from three or four feet in some places to sixty-six in others. A large part of the land originally existing, of which it was the northerly part, has been washed away by the action of the sea from time to time. The plaintiff owned a tract of land, comprising over thirty acres, immediately north of the line of the wall, for the entire length of the strip, with the exception of a portion occupied by a regular highway of the town of Orange, which had been made by the State and was a good road. The trend of the shore line along this strip was somewhat northeast and southwest. No fences had ever existed between the stone wall and the Sound. The land in controversy had, until recently, been of little value. There was no proprietors' committee in the defendant town. The plaintiff introduced evidence tending to show both title and possession.

The sole defendants were the town, and three persons described as its selectmen. It was admitted in the pleadings that these persons were such selectmen, and as such and by its authority had claimed that it owned the land in dispute, and that they claimed no interest in their own right. The answer denied the plaintiff's title to or possession of any land south of the line of the stone wall, and set up (1) ownership and possession in the town ever since its incorporation in 1822, and, before that, in the town of New Haven ever since its formation; (2) title in the town under a deed to it from Walter Wilmot given in 1846; (3) that the land had been reserved for a highway by the town of New Haven in 1686, and ever since used as such; (4) that it had been used as a highway from time immemorial; (5) that it was a public beach; and (6) that from time immemorial it had been a town common whereon the citizens of the State had and had exercised the right of entry and occupation to gather seaweed, catch fish, dig shell-fish, enjoy

for picnic purposes, and use for access to the public waters of the State.

In support of their answer, they introduced evidence tending to prove that in early colonial times and until recent years, the main road from New Haven to Bridgeport lay inland, crossing Jones hill, some distance northerly of the land in question; and that this road and also one over the strip in controversy were thus described in the New Haven town records in 1686 : "In $y^e$ laying out of $y^e$ 3d division on $y^e$ west side beginning at $y^e$ place called Malbone Cove, Henry Bristolls Lott was first which began as soon as $y^e$ land would bear as $y^e$ sizers adjudged wherein a considerable piece of Comons was left between $y^e$ sd Bristoll's Lott & $y^e$ Meadow, from which Comon was land allowed at least 4 rod wide by $y^e$ seaside round to Oyster river mouth & soe at $y^e$ reare of $y^t$ teere of Lotts a highway from $y^e$ Comon, down to sd Oyster river mouth between $y^e$ sd teere of Lotts & Benjamin Bunnels Lott which near Oster river mouth was about 12 rod wide & so running to $y^e$ sd Comons as the sd lines will beare not to be less than 4 rod wide in any place & soe from $y^e$ sd highway at sd Oister river mouth a highway round by $y^e$ sd meadows $y^t$ the . . . northwest side of Edward Preston's Lott wher ther is another highway as Mr. Harriman gives account of; . . . In $y^t$ part of $y^e$ third division in Newhaven that was layd out in $y^e$ yeare 1681. Ensigne Jno Miles, Daniel Sherman and John Clarke, Sizers & John Harriman Surveyor $y^e$ highwaies are as followeth 1. From the Comon on $y^e$ East to $y^e$ Meadow at Oister river on $y^e$ west a highway of four rods wide at $y^e$ East end & about 6 rods at $y^e$ meadow bounded by John Downes his land on $y^e$ North." The road last described was claimed by the defendants to be the Jones hill road.

The plaintiff offered evidence tending to prove that prior to 1846 there had been no highway over the land in question, but the Jones hill road was the regular road from New Haven to Bridgeport, and a branch ran down from it to the shore near the land in controversy.

The deed from Walter Wilmot, set up in the answer as supporting the title of the town, was a quitclaim deed executed and recorded in 1846, of " a piece of land lying in the town of Orange, and laid out for public highway, containing four acres, more or less, bounded easterly by land of James Ward: southerly, by an old stone wall, or where the old fence formerly stood: westerly, by land of Hannah Brown; and northerly, by my own land." The defendants asserted (and the plaintiff denied) that this conveyance embraced the fee of the highway which they claimed to have been laid out between the stone wall and the Sound.

The plaintiff produced a series of conveyances of the whole tract described in his complaint, under which he claimed title, running consecutively from 1829 to 1894; the first being from one Thomas Ward, and Walter Wilmot being one of the intermediate grantors. Since 1894 the plaintiff has been the owner. In each of these conveyances the tract was bounded either on the south or the east by Long Island Sound.

The defendants then introduced an earlier chain of deeds of the same property, the latest being to said Ward and the earliest by Thomas Trowbridge. The latter, in 1688, conveyed to Daniel Thomas land described as " forty-five acres of areable or woodland, of & belonging to $y^e$ sd Thomas Trowbridge, called also third division land, situate, lying, & being at Malborn's cove, in New Haven aforesaid, bounded northeast by Henry Bristow's land: southwest, by Wm. Johnson's land: southeast, by the Sound; & northwest, by a highway, being 160 rod long, & 45 rod in breadth "; and in 1689, to Wm. Johnson, " one peece or parcel of arable or woodland, being third division land, soe called, containing by estimation sixty-six acres, more or less, situate, lying, and being on $y^e$ west side of New Haven, afore sd, at or near a place commonly called Malborn's cove, $y^e$ sd land being eight score rod in length, and bounded northeast by Daniel Thomas his land: southwest, by land of Ebenezer Brown: southeast, by the Sound; & northwest, by a highway." Johnson conveyed his tract a few days later, bound-

ing it on "the Comon about northwest; and running to a highway next $y^e$ sea, about southeast;" and Thomas, in 1691, conveyed his, bounding it "easterly, by a highway by $y^e$ seaside." The later conveyances described it as bounded "south by the beach," "southerly on highway," "east by the highway by the sea," or "easterly by an highway which runs near the sound."

Patents were also introduced from the Colony of Connecticut, one granted in 1685, confirming to the proprietors of the township of New Haven and their heirs, successors and assigns forever, the lands then comprised within the bounds of the township, abutting "on the Sea or Sound on $\dot{y}^e$ South from $y^e$ mouth of Oister river to the mouth of Scotch Cap or Stony River"; and another, granted in 1704, confirming the same lands to the proprietors at the date of the first grant and "their heirs or assignes or others lawfully deriveing & holding from by or under them or any of $y^m$ Respectively forever in such maner & by such devidends allottments & proportions as have been granted assigned & laid out to each of them severally by $y^e$ grants votes and orders of $y^e$ inhabitants & propriators in any meeting or meetings Regularly assembled & that at any time or times hereafter shall or may further be allotted assigned & set forth according $w^{th}$ proportionable Right and priviledge in $y^e$ Comons & Lands yet Remaining to be divided."

The defendants introduced parol evidence, including declarations of aged persons since deceased, in support of their averments as to the character and use of the land southerly of the stone wall, as a highway, and as a town common, and as a public beach, and as the absolute property of the town and in its possession.

The following papers were also laid in: A warranty deed from one Goodsell, dated October 7th, 1872, conveying an interest in the farm formerly owned by Walter Wilmot, described as bounded "southerly by Long Island Sound," excepting from the covenants "a claim by the town of Orange to the whole or a part of the shore front of said land, which claim is to be removed by me"; a vote of

the town of Orange, passed on the same day, instructing the selectmen to convey to E. B. Wilmot a strip of land "lying between the Wilmot farm, so called, and the shore"; and a quitclaim deed to him given by them a few days later, for the consideration of $500, of a strip of land "lying on the seashore in front of the Wilmot farm, so called, being bounded northerly by a road ordered by said town to be laid out fifty feet wide, running to a point at the easterly end: southerly, by the stone wall as it formerly stood; and westerly, by land owned jointly by Philos B. Tyler and the town of Orange aforesaid, being a part of the premises conveyed to said town by Walter Wilmot, by deed dated August 27th, 1846, and recorded in Vol. 5, on page 478 of Orange land records."

Among the papers in the plaintiff's chain of title was a deed executed in 1871 by E. B. Wilmot to George W. Ward and others, who gave a mortgage back to Wilmot; and a certificate of foreclosure of the mortgage, obtained in 1877 by parties to whom Wilmot had assigned it in 1873 and under whom the plaintiff claimed.

He also introduced certified copies from the town land records of several quitclaim deeds by which, in March, 1874, said Ward and one Henry A. Warner conveyed their respective interests in certain lots in Orange shown on a "Map of 141 Shore Building Lots" surveyed in 1873, to F. J. Whittemore, and he with said Warner conveyed to said Ward their respective interests in certain other of these lots. A map corresponding to this description had been laid in, and, so far as appears, without any exception to its admission, showing that the lots so mapped comprised the land in controversy and ran to the Sound.

These copies were admitted, notwithstanding objections made on the ground that they were of deeds not thirty years old, and there was no direct evidence that the grantors were in possession when they were executed, and the owners of the mortgage were not parties to them.

The certificate of foreclosure obtained in 1877 was in the form then prescribed by statute. In the absence of evidence

to the contrary, the foreclosure presumably cut off all interests under the deed given in 1873, and those who obtained it became invested with the full legal and equitable title to the lots conveyed by them. The releasors in these deeds appeared to have been part owners of the equity of redemption. It is to be presumed, *prima facie*, that they were in possession when they made the conveyances. *Noyes* v. *Stillman*, 24 Conn. 15, 21. Under these circumstances, the copies from the record were legitimate evidence. Technically, the strict foreclosure of a mortgage works no change in the legal title. The party who obtained the decree, after it has become absolute as well as before, derives whatever legal title he possesses from the mortgage, and has simply converted it into an absolute title, as against the defendants in the cause, by extinguishing their equities of redemption. But so long as these equities are unextinguished and those who hold them retain possession of the land, their acts done in connection with and affirmance of their possession may be important in determining to what their possession extended, if its limits are afterwards called in question by those claiming adversely to the mortgagee. The making of the map which has been mentioned and the conveyances based upon it were acts of that nature. That a deed is not an ancient one does not preclude its proof by a certified copy from the land records, when the parties to it are not parties to the cause.

It may be that these papers would have been introduced more appropriately in reply to the evidence in defense, but, if so, their admission out of order in a case like this came fairly within the discretion of the trial court.

It does not follow, however, that a mortgagee is so far in privity with a mortgagor that the latter's naked declarations, made after the delivery of the mortgage, can be received to disparage the former's title. They stand on lower ground than that occupied by declarations embodied in a conveyance of the equity, given as the conclusion and formal consummation of a business transaction. Acts speak louder than words.

Evidence of conversations with Ward and others, after the mortgage to Wilmot, as to the boundaries of the land in controversy were therefore rightly excluded, when offered by the defense.

The defendants offered in chief the testimony of certain old inhabitants of the town, living near the land in controversy, and of others who had been its selectmen, that they never heard of any claim of private ownership in it or any question but that it was a public beach, until shortly before this suit. It was properly excluded. The plaintiff had proved a paper title in himself, under an unbroken chain of deeds on record running back to 1829. This, in connection with his evidence of actual possession, was sufficient to support his action, and the parol evidence in question was of too remote a character to be received to prove the claims set up in the answer.

Testimony from one of the same witnesses, that it had been the general reputation in the community that the land in question was public ground and that there was a highway over it, was also properly excluded. The only reputation which is admissible to establish such facts is that of a past generation. 2 Wigm. on Ev., § 1582.

Another witness was called in defense, who testified that he had a conversation with one Benham, an old inhabitant of the town, since deceased, in respect to the rights of the public in a certain piece of land. Being then asked what was said, he replied that Benham said "the town of Orange owned from that fence to the Sound." On objection that the inquiry ought to be so framed as to confine it to a particular subject-matter, it was excluded together with the answer. Technically the objection was well taken as, for aught that appears, the land of which Benham spoke might be neither identical with nor contiguous to that in reference to which the suit was brought. If the witness could have shown that it was, the defendants should have renewed their question in a better form.

The first selectman and town agent of Orange testified for the defense that he had seen people camping on the land

Dawson v. Orange.

in controversy. He was then asked if he had, in his official capacity, given any one permission to camp there. It not being claimed that he had given it on or near the land, or in sight of it, nor that those to whom he had given it used it or were those whom he saw camping on the land, proof of such permission could not have been admissible as an act accompanying and characterizing possession. *Turner* v. *Baldwin*, 44 Conn. 121. It was, at most, a mere assertion of a right on the part of the town to control the occupation of the land. While it was not claimed that he had been authorized to take such action by the board of selectmen, it was of such a nature that if the town had such a right of control, the town agent could, in the absence of a vote of the selectmen to the contrary, properly assume its exercise. *Hoyle* v. *Putnam*, 46 Conn. 56, 62. But the declarations of a municipal officer are no more admissible to establish a municipal right than would be those of a private individual to establish a private right, against one adversely interested, when made in his absence. The question was therefore properly excluded.

Evidence was offered in defense that E. B. Wilmot, the original mortgagee, since deceased, under whom, through a foreclosure of the mortgage, the plaintiff derived his title, while the owner of the mortgage, made a certain statement at a town-meeting as to the boundaries of the mortgaged premises, which was of the character of a declaration against interest. The remark made was not otherwise described, except by the claim that it came from Wilmot when he was endeavoring to prevent the bringing of a suit against him which had been threatened by Dr. Painter and others, who at one time owned the equity to redeem the mortgage, for a breach of the warranty of title in the conveyance by him of the land subject to the mortgage. The town-meeting in question was one of several held to take action as to a release by the town of Orange to said E. B. Wilmot of its title to the land conveyed to it by Walter Wilmot in 1846. Dr. Painter was present at the meeting and was the witness called to testify as to the statement made.

It did not appear that Dr. Painter, at the time in question, held any interest in the land in controversy. Nevertheless, if the remark of Wilmot was of the kind claimed, it would be admissible against the plaintiff, as a privy in estate.

It is found, however, that testimony from Dr. Painter was introduced by the defendants that he had, at about this time, conversed with Wilmot as to the boundaries of the land in question, with reference to the action desired from the town, and had been told by him that the southerly boundary was the Sound. In view of this, and of the failure of the defendants to specify particularly what remark Wilmot made at the town-meeting, as well as of the fact that, if it differed from what he said in his conversation with Dr. Painter, it would be inconsistent with the language of his title deeds, we think the ruling constituted no sufficient ground for a new trial. *Hamilton* v. *Smith,* 74 Conn. 374, 378; *Norman Printers Supply Co.* v. *Ford,* 77 id. 461, 465.

The same witness was asked what connection, if any, he had with the land in controversy, at the time of the town-meetings. There was no error in excluding this question. If he had any title to it, documentary proof should have been offered. If he was an agent for the owners, the inquiry was ill adapted to call his attention to that fact.

One of these meetings was called to take action " in regard to conveying to Ephraim B. Wilmot what right the town may have in a certain piece of land which was conveyed by the late Walter Wilmot to said town, lying on the southerly side of the road leading from the cove to the Tyler farm." It was undisputed that the road thus described ran over the upper portion of the land conveyed to the town by Walter Wilmot in 1846. Dr. Painter was asked if at that meeting he submitted a proposition in behalf of the then owners of this land.

There was no error in excluding this inquiry. It was admitted that the record of the meeting stated in full a proposition which he had submitted. The warning of the meeting excluded any action as to the land in question in this cause, but if either the fact of his offering it or the

terms of his proposition bore upon the matters now in issue, whatever the records showed in regard to the proposition should have been proved by a copy.

Such a copy was afterwards offered in defense and excluded. It showed that the proposition was for a conveyance by the town through its selectmen to Wilmot of " all that portion of land in front of the Wilmot farm, so called, excepting a strip now occupied by the road 50 feet in width, on such terms as shall seem to them judicious, and that such conveyance be effected before the 1st of September, provided on consultation with legal counsel such course shall be considered legal." The exclusion was proper. The proposition must be interpreted in connection with the warning of the meeting, and obviously referred only to land northerly of the line of the old stone wall.

The court also excluded copies of the record of three earlier town-meetings, held in 1871 and 1872.

The first two were called to " act upon a proposition of relinquishing the ground now occupied as a highway in front of the Wilmot farm, so-called, upon the shore, together with all lands conveyed to said town of Orange by Walter Wilmot on the front of said Wilmot farm, between the Allen farm on the west and the Miller farm on the east, and accepting instead of said present highway a sixty-foot straight road in front of said farm, together with an improved highway across the pond, and around on the shore, twenty-five feet wide, inside of the present old wall, both of which roads shall be delivered to the town in a condition satisfactory to the board of selectmen." At the former of these, a motion to relinquish the claim of the town " to land on the shore deeded the town by Walter Wilmot " was defeated : at the latter, a committee was appointed to report on " the subject of relinquishing the ground used as a highway in front of the Wilmot farm on the shore." The third meeting was called to hear the report of this committee, which was for the indefinite postponement of the proposition " in reference to the change of certain roads, and disposal of certain lands in the vicinity of the Wilmot farm."

The Superior Court was right in holding that nothing in these records was relevant to the matters in issue either in chief or in rebuttal. That the only admissible construction of them is that they relate solely to the property conveyed by Walter Wilmot in 1846 is evident from their terms, and confirmed by other copies which the defendants had already introduced; namely, of the record of a final meeting of the town, held October 7th, 1872, called to act on "conveying to E. B. Wilmot a strip of land lying between the Wilmot farm, so called, and the shore," and which authorized such a conveyance; and of a quitclaim deed given to him in pursuance of such authority, on October 21st, 1872, of "a certain strip of land situated in said town of Orange, in the parish of West Haven, and lying on the seashore in front of the Wilmot farm, so called, being bounded northerly by a road ordered by said town to be laid out fifty feet wide, running to a point at the easterly end: southerly, by the stone wall as it formerly stood; and westerly, by land owned jointly by Philos B. Tyler and the town of Orange aforesaid, being a part of the premises conveyed to said town by Walter Wilmot, by deed dated August 27th, 1846, and recorded in Vol. 5, on page 478 of Orange land records."

For similar reasons to those already given, testimony offered as to certain statements made at these three meetings by Painter and others interested in the equity of redemption in the land in controversy was properly excluded. These statements were part of the discussions and negotiations which led up to the conveyance by the town to E. B. Wilmot in October, 1872. To admit them would have tended to confuse the jury as to what was really in issue and, by introducing collateral matters concerning land not in controversy, increased the complications of a complicated cause.

Nor is it a sufficient ground of appeal that testimony was excluded, offered by the defendants to show that at one of the town-meetings E. B. Wilmot made a statement "regarding his ownership of property at or near the Fresh Water pond," and "in front of the Fresh Water pond." The land in controversy was near that pond, but so was the whole of

the " Wilmot farm." It lay in front of it, but so did a strip of land northerly of the line of the old stone fence. Such a question could only be supported by a specific claim that the statement related to the matter then in issue.

A witness was asked if Wilmot had to his knowledge attempted to secure the ownership from the town in 1870, 1871, or 1872, of the particular land in controversy. This was objected to both as to form and substance, and excluded. It is sufficient to justify the ruling, that the question was objectionable in form. It should, after such an objection, have been so modified as to confine the scope of the inquiry to his knowledge of communications or statements made by Wilmot with reference to the subject of the inquiry. Whether they might amount to an attempt to secure the title it was not for the witness to say. They might have been a mere offer of Wilmot to buy his peace.

Evidence was offered of votes of the town in 1831 and 1832, each appointing an " agent to sell stone on the seashore," together with testimony from a witness that he had in his early recollection seen vessels lying off the beach the title to which was in issue, on board which stone was being loaded from it. It was claimed that these votes referred to the land in controversy, but no other proof of this was offered.

This evidence was of so remote a character that it was properly excluded. The votes, on their face, might have referred to any part of the extensive line of seashore which bounds the town, and those loading stone on the vessels might have been mere trespassers.

A town-meeting was held in 1894, called to act on, and by which was granted, a petition by an electric railway company for the privilege of laying tracks " on and over a certain piece of sandy beach, owned by the town, situated in front of Waverly Grove, between the West Shore highway and the Sound." Another meeting was held in 1900, to consider, among other things, " the matter of selling a piece of common land, situated near the shore at Waverly Grove," at which the matter was indefinitely postponed.

The records of these meetings, offered by the defendants, were properly excluded. It was admitted that the land described in them was not the land in controversy, but that it was near to it and of somewhat similar character. The claim of the defense was that both parcels were part of a long strip of common land, and that this was thus described in the vote of the town of New Haven in 1686 : " a considerable piece of Comons was left between y$^e$ sd Bristoll's Lott & y$^e$ Meadow, from which Comon was land allowed at least 4 rod wide by y$^e$ seaside round to Oyster river mouth and soe at y$^e$ rear of y$^t$ teere of Lotts a highway from y$^e$ Comon, down to sd Oyster river Mouth." The trial court was warranted in ruling out evidence of so remote and conjectural a character. If it were so that one parcel on the shore had remained common property for two centuries, it was no natural inference from this that another had ; and it would have been going too far to let it be presented to the jury as the ground for such an inference.

This town vote of 1686 was admitted by the trial court for the sole purpose of proving the dedication of a highway, although the defendants offered it in chief in support of each and all their defenses. In this ancient record the vote is prefaced as follows : " A Towne Meeting in New Haven y$^e$ 27th of December, 1686. The Townsmen acquainted y$^e$ Towne that they had considered y$^e$ highwaies about the Towne and gathered them together as far as they can find any and have been already staked and have thought it necessary they should be recorded, and then what they had prepared was read unto y$^e$ Towne, and is as here followeth:

" For as much as highwaies are necessary to knowne & kept for Comon Roads & perticular psons to goe to theyer lands, meadows, Comons the Townsmen have gethered together all y$^e$ highwaies that are yet staked wch they know of to be recorded." Then, after the descriptions of highways first above quoted, came this conclusion : " Thees forementioned highwaies in y$^e$ third division when y$^e$ Towne had heard y$^e$ surveyor's descriptions, they ordered they should be allsoe recorded."

The colony patent of 1685 had constituted the "proprietors, inhabitants of New Haven" and their heirs, successors and assigns forever "one Intire Township of & within itselfe, invested with such liberties priviledges & powers to manage theyre owne plantation affairs according to law as hitherto to all intents and purposes whatsoever." They had previously obtained such title to their lands as the Indians could give, and during the existence of the colony or "jurisdiction" of New Haven, the plantation of New Haven had claimed and exercised govermental powers. The absorption of the colony of New Haven by the colony of Connecticut left in some doubt the legal effect upon land titles of the early doings of the plantation. No title to real property could be deemed clear that was not traceable to a grant from the crown. Hence was sought the patent of 1685. Hence also the proprietors would naturally be anxious as soon as possible to put on the town records some account of what had been previously done by them or their predecessors in dedicating any part of their lands for highway purposes. To this end the selectmen or, as they were then called, "townsmen," during the year next following, prepared for record the paper now in question. It was well adapted to the object in view, but there was nothing in it which purported to throw out or retain land for anything but highway purposes. Whether the common to which it referred embraced any part of the land in controversy in this cause did not appear. It was not disputed that that land had been alloted six years before in severalty to Thomas Trowbridge. The existence of a highway over it would not be inconsistent with the allotment. To treat any part of it as common, that is, undivided land, clearly would be. The nature of the institution of trial by jury is such as to require the presiding judge to be vigilant in keeping irrelevant and incompetent evidence out of the case, and in determining what is irrelevant he must have regard to the particular circumstances involved in the issue. Those bearing upon the paper in question were such as to make it one easy to misapprehend, and the limitation prescribed by the trial court

to the use to be made of it before the jury was within its power.

Several other rulings as to evidence were made reasons of appeal, but, as they were not pursued in argument, it is unnecessary to consider them.

In determining whether the trial court was justified in directing the jury to find the issues for the plaintiff, it is necessary first to inquire what those issues were. The complaint alleged that the plaintiff claimed to own, by inheritance from his father, an unincumbered estate in fee simple in an entire parcel of land of about thirty-seven acres, bounded south on Long Island Sound. The answer denied that he had title to or possession of a small portion of this parcel described as lying south and east of the line of an old stone wall. That he claimed to own it was not denied, and any right or title in the defendants to the residue of the land was expressly disclaimed, except as to a highway which ran over it.

If it be assumed that an issue was thus raised involving a question as to the right of action, in the same manner as if the complaint had alleged, not only a claim of title, but a title, it is clear, upon the admitted facts, that the plaintiff was pursuing an appropriate remedy. His claim was supported by a paper title under a chain of conveyances running back for a long period of time. If any proof of possession were also necessary, beyond that presumed from title, there could be no question that he had fully supplied it. He therefore had fulfilled whatever burden of proof rested upon him.

Before committing the cause to the jury, two of the defenses pleaded were struck out of the answer by order of the court. These were that the land in question was a highway, and a public beach. Sufficient evidence had been introduced in support of each to require the submission to the jury of the issues closed upon it, if they were of any legal importance.

But they were not. The sole matter on trial was whether the plaintiff was entitled to have his title quieted as against

the town of Orange. A town, as such, has no title to, or lien upon, or right of property in, a town highway. This statutory action is given only to settle conflicting claims to an estate or interest in, or lien or incumbrance on, real property. The right, adverse to the owner of the soil, which follows from the establishment of a highway, accrues to the general public. That the duty of maintaining and repairing it is thrown by law upon the town invests it with no title to the servient tenement. It may change the face of that tenement by removing materials for use on other highways within its limits, but this is a mere incident of the duty to repair and maintain such other highways. *New Haven* v. *Sargent*, 38 Conn. 50. It is not an independent right which can be regarded as an estate or right of property in the soil on which any of the town highways are laid out. The town is a mere governmental agent. It acts for the State, because the State requires it, and only so far as the State authorizes or directs. *Bartram* v. *Sharon*, 71 Conn. 686, 692; *Upton* v. *Windham*, 75 id. 288, 291. All rights and duties relating to highways could at any time be taken from towns by the General Assembly and entrusted to any other agency, or assumed directly by the State itself. It was not the town of Orange, but the general public and the State, so far as it is their representative, who were adversely interested to the plaintiff, if there was a highway upon the land in controversy. *Benham* v. *Potter*, 52 Conn. 248, 252. A municipal corporation charged with the duty of maintaining a highway has such an interest in keeping it in proper and safe condition that under certain circumstances it can, to further that object, institute suits for equitable relief. *Burlington* v. *Schwarzman*, 52 Conn. 181, 182; *Stamford* v. *Stamford Horse R. Co.*, 56 id. 381, 395. But it by no means follows that it can set up a claim of title under the statute now in question. In the one case it seeks aid to enable it to perform a statutory duty: on the other it seeks to make this duty the foundation of a proprietary interest.

There was no colorable ground for a claim that the town

had any other proprietary interest in the land in question, if it were indeed occupied by a highway, than belongs to every town in respect to every highway.

It has long been settled that when the ancient proprietors of common and undivided lands within a town, having laid out land as a highway, conveyed the adjoining lands as bounded on the highway, they had no remaining right in that highway. *Chatham* v. *Brainerd*, 11 Conn. 60, 82. Much more could they retain no right in lands allotted in severalty when, at or before the time of the allotment, a highway was laid out over them, and the allotment was bounded on lines exterior to and including such highway. The allotment to Thomas Trowbridge, if it followed the vote of the proprietors of New Haven under which it was authorized, was bounded " by the sea." That it did follow it is to be presumed. *Ex diuturnitate temporis omnia præsumuntur rite et sollemniter esse acta.*

But had the proprietors retained either the fee or an easement in the highway skirting the shore, no subsequent conveyance of it was shown under which the town of Orange could claim as their successor. By the laws existing in 1822, at the date of its incorporation, " whatever part or interest " such proprietors may have had in any common or undivided land not disposed of was " allowed and taken to be their proper estate." Statutes, Rev. of 1821, p. 304, Chap. II, § 1. The resolution incorporating the defendant town did not purport to transfer to it any property interest in common and undivided lands in the town of New Haven. 1 Private Acts, p. 1173. If the town of New Haven had any such right in respect to the land in controversy, it remained, so far as appears from this record, with that town. *Hartford Bridge Co.* v. *East Hartford*, 16 Conn. 149, 172. If the proprietors of common and undivided lands in the town of New Haven had any such right, it remained, so far as appears from this record, in them, or subject to the disposition of their committee.

If the land in controversy was a public beach, the town of Orange was, so far as appeared, equally without any

proprietary interest in it. The term " beach " is used sometimes for the shore between high and low water mark, and sometimes for a strip of land lying next to and above such shore. A public beach is one left by the State, or those claiming under it, open to the common use of the public, and which the unorganized public and each of its members have a right to use while it remains such. *Merwin* v. *Wheeler*, 41 Conn. 14, 24, 26; General Statutes, § 4683. The land in controversy did not extend below ordinary high water mark. Being above the shore it was included in the colony patents. *Church* v. *Meeker*, 34 Conn. 421. It was also included in the allotment to Thomas Trowbridge, since that bounded his land by the sea. It may, however, have since been dedicated by him or those claiming under him, to the use of the general public. This would make it a public beach, and acts of user by the general public might serve to establish such a dedication. They would not, however, tend to show any title or interest in the town of Orange. Here again, as in the case of a highway, the only proper representative of the interests of the general public would be either a sufficient number of those belonging to it, made parties for that purpose, or the State.

By replying to these two defenses (that the land was a highway, and a public beach), the plaintiff waived his right to move to have them expunged. It was, however, the right of the court to expunge them of its own motion. This was an appropriate mode of defining and limiting the issues to be answered. Practice Book, §§ 185, 186; General Statutes, § 614.

That action left, as the only matters to be considered, title in and possession by the defendant town. It claimed title and possession in its own right, and also that it held the land as a town common. These were affirmative claims, and the burden of proving them rested on those by whom they were pleaded.

The controlling evidence before the jury was of a documentary character. The construction of the various deeds and records, upon the undisputed facts, was for the court.

The trial judge was right in holding that they failed to establish any of the remaining claims.

The land out of which allotments, in one of which, made to Thomas Trowbridge, it was not disputed that the strip of land in dispute was embraced, was described in the vote of the town of New Haven of December 20th, 1680, as extending from a point beginning on the east at Malborn's Cove "a long by y$^e$ Sea to Oyster river." The Trowbridge allotment was a large tract, and in 1688 and 1689 he conveyed it in two parcels, bounding each northwest by a highway and southeast by the Sound. In subsequent conveyances, one of his immediate grantees described his lands as "running to a highway next y$^e$ Sea, about southeast," and the other described his as bounded "easterly, by a highway by y$^e$ seaside." In those early days it was natural to treat a highway along the shore as of more importance as a bound than the shore itself. The effect under the laws of Connecticut of laying out a highway upon the title to the land over which it runs was then unsettled, and for more than a century later it remained a mooted question whether the public right did not preclude or extinguish all private right in the soil. In 1814 this question was finally put at rest by a decision of this court. *Peck* v. *Smith*, 1 Conn. 103. In 1829, in a deed to a predecessor in title of the plaintiff, of the tract in which he claims that the land in controversy is included, it is described as bounded on the Sound; and in all the later conveyances similar words are used. That in some of those of an earlier date the highway along the shore is made the corresponding bound is of no controlling weight. There was nothing to show any conveyance by any of the plaintiff's predecessors in title of the land covered by the ancient highway, or of any estate or interest respecting it, to the town of Orange or its predecessors in title. The deed of 1846 from Walter Wilmot to the defendant town obviously covered nothing below the line of the old stone wall. The grant to Thomas Trowbridge had been confirmed by the colony patents of 1685 and 1704. It could not (except by proceedings in the

Dawson v. Orange.

nature of eminent domain) have been resumed or abridged by town, Colony or State. *Symsbury Case*, Kirby, 444, 447.

The statute (§ 4053) is concerned only with questions of title. Every defendant who makes a claim adverse to the plaintiff must " set out the manner in which, and the sources through which " he acquired what he claims. The duty of the court is to " determine the rights of the parties, whether derived from deeds, wills, or other instruments, or sources of title." The only sources of title set out in the answer to support the claim of an estate in fee in the town of Orange or of a tenancy in its own right for its own benefit, were (1) a title in the town of New Haven, acquired from or recognized by the original proprietors of the soil, at the time of its original formation, and continuing ever after until 1822, when it was transferred to the town of Orange by virtue of its Act of incorporation ; (2) the deed of 1846 from Walter Wilmot; and (3) possession from time immemorial, first by the town of New Haven and then, after 1822, by the town of Orange.

As to the first of these sources of title, the records showed that the original proprietors owned the land in controversy and disposed of it in town-meeting, as if it were town property. In early days the proprietors of the common lands within the limits of a town sometimes followed this practice, and sometimes made particular allotments or grants at meetings of their own, to which none were admitted but the original proprietors and such as might legally represent them. Session Laws of the Colony of Connecticut, 1723, Ed. 1715, p. 287; Statutes, Ed. 1769, p. 122. But the proprietors of common lands in New Haven, as has been seen, instead of transferring the land now in controversy to the town or recognizing it as town property, allotted it to Thomas Trowbridge, under whom the plaintiff derives title, in severalty, more than a hundred years before the incorporation of the town of Orange. There was no proof that Thomas Trowbridge's title had ever been transferred to either town except that, of the conveyances under which

the plaintiff derived title, some, given before, and some given shortly after, the incorporation of Orange, bounded the land southerly on a highway. This as already shown is, in view of the nature and former use of the land, evidence of so weak a character that it could not have supported a verdict for the defendants.

The second source of title alleged has been already sufficiently considered.

As to the third, no evidence was adduced of possession by the town of New Haven after the allotment of 1680 to Thomas Trowbridge, and none of possession by the town of Orange which would have warranted a verdict in its favor.

There was testimony tending to prove that the town, through its proper officers, had taken stone from the land in controversy for highway purposes, and prevented the removal of stone by private individuals for private purposes who had secured permission to remove it from the plaintiff's father and immediate predecessor in title, and that the land had been used "from time immemorial by a large number of people for purposes of pleasure, the piling thereon and carting away therefrom of seaweed, rockweed, driftwood, and for kindred purposes ; also, the travel upon it for access to and from the shore for purposes of clamming, fishing, etc., and the use of the same by camping and picnic parties, and that fires were built upon said premises by picnic parties and campers for roasting clams or for other purposes ; and that people from all portions of the State had been and are accustomed to enter upon, and use and enjoy said land according to their pleasure ; and that numerous persons had never been interfered with or prohibited in any manner by the plaintiff, or his predecessors in title, from such use of the land."

The doings of town officers thus described were within their right if the land were, as the defendants claimed, a highway. The use of the premises by others for any or all of the purposes mentioned was within their right, if it were, as claimed by the defendants, a public beach : for some of

them it was within their right, if it were a. highway. *Nelson* v. *Branford L. & W. Co.*, 75 Conn. 548, 551. See General Statutes, § 1342.

The claims as to a highway and a public beach having been struck out, it would have been misleading to allow this evidence to go to the jury as evidence of such possession by the town as would constitute an adverse interest in the land within the meaning of the statute.

The sources of title set out in the answer, to support the claim that the land in question was a town common, were its use from time immemorial, of right, by the citizens of the State generally, at their pleasure, for gathering seaweed, catching fish and shell-fish, and access to and enjoyment of the public waters of the State, and picnic purposes; that on the first formation of the town of New Haven it secured title thereto from the original proprietors, who ever after recognized the proprietary title of the town to the land as a town common; that the town continuously exercised rights of ownership in it until the incorporation of the town of Orange; and that title was then transferred to the latter town, which has ever since been in possession, claiming to own it as a town common.

To establish these sources of title the defendants relied on the evidence already mentioned as claimed to establish a title in fee simple and to show immemorial possession, and also produced evidence tending to show " that in years past the land in question had been said to be. common; that the father, now dead, of one of the witnesses had told him that the land between the old stone wall and the Sound from Cove river all along the shore to Oyster river was common; also, that parties working for the town had carted stone from the land in controversy; that persons now deceased had declared that a right of common existed on the land in controversy, and that this land belonged to the town; that it was common land of the town, common property, and that they had a right to the seaweed; that people back from the shore were formerly accustomed to bring their cattle down to this beach for salting; that said land had

been used for a period of years whereof the memory of man runneth not to the contrary as a town common, whereon every one had and has the right to enter, and did enter according to his pleasure, for the purpose of gathering sea-weed, rockweed, and driftwood, catching fish, clams, and oysters, and otherwise taking the benefit of the public waters of the State adjacent thereto"; that Dr. Painter, when an owner of the equity of redemption, had been stopped by the selectmen from building a road across the land in controversy, at right angles to the Sound; and that thereupon he had threatened to sue E. B. Wilmot, his grantor, for a breach of warranty as respects all the land between the State road and the Sound (which embraced the strip in controversy), in consequence of which Wilmot had procured the consideration of the subject at the town-meetings held in 1871 and 1872 which have been above described.

Carting stone from it, and preventing Dr. Painter from building a new road transversely across it, were acts which would be justifiable if it were the site of a highway, and would naturally be referable to conditions attending a use for that purpose. The other acts of enjoyment by people generally were such as would naturally be expected if the land were a public beach, and went to show a right in the public rather than the town.

This leaves no substantial evidence that the land was a town common except that of reputation, and declarations from aged inhabitants of the town, since deceased. Testimony of this nature is admissible and relevant, but from its inherent character it is of feeble force if inconsistent with a paper title established by the public records.

This land could not be a town common unless it had been reserved as such by the early proprietors of the common and undivided lands within the limits of the town of New Haven, nor unless it had been transferred in 1822 to the defendant town. To show that it had been so reserved the defendants relied on the ancient records of New Haven. These showed that a committee had been appointed prior to 1673 "about staking Comons." At a town-meeting in

1674, " It was moved & by sundry desyred that yᵉ bussy-
ness about Comon lands might bee considered and brought
to issue, and it was ppounded that yᵉ lands yᵗ are capable of
emprovement might bee devided, and that lands, and that
lands yᵗ are rocky and uncapable of emprovement might lye
comon, and that before and devision be made, there might a
portion of land be appointed and staked for the standing
Comon of yᵉ Towne, as also it was desyred that yᵉ Comittee
would prepare theyer considderations about such lands &
comons against yᵉ next Towne Meeting." The committee
reported to a meeting held in March, 167⅘, " First for Co-
mons, that yᵉ lands between yᵉ Mill River and yᵉ West
River (wth out yᵉ oxe Pasture and lands in pprietye) lye
for a standing Comon for the Towne & to extend soe high
Northward as yᵉ Brooke above yᵉ Shepherd's Plaine, and
wher yᵉ Path runs on yᵉ sd Brooke, a line westward or west
and by north, as upon triall may bee found, that it bee such
a line that will run one miell above Jno. Sackett's or more
as yᵉ Comittee judgeth, and also that other sutable tracts of
land, in yᵉ severall parts of the Township, be staked out for
Comons by a Comittee appointed by yᵉ Towne for that pur-
pose, and yᵉ same Comittee to view what lands are fitt to
bee layd out in pprietyes." These recommendations were
adopted and a committee chosen to " stake out Comons and
viewe yᵉ land about yᵉ Town in all yᵉ parts of it, and after
theyer viewe to informe yᵉ Town what they have done, and
did by voot choose and appoint En. Jno. Miels, Jeremiah
Osborne, Jno. Cooper Sen Samuell Alling, Jno. Tomson,
Joseph Moss, Thomas Tuttle, David Attwater, Jno. Pottes,
Jno Clarke, James Heaton, Allan Baall and Joseph Mans-
field, all of them or yᵉ major part of them agreeing to stake
out yᵉ Comons, and make return of lands fit to be layd out."

No report from this committee is to be found on the
records. Four years later, on December 29th, 1679, the
town voted to lay out the third division of common lands
and make allotments in severalty to particular proprietors
of the lands in question, to " begin at Mr. Malborns Cove
by yᵉ Sea and go on towards Oister river as far as land

will be found fit to lay out and then from Oister river northward by y⁰ bound line between N Haven and Milford and come round unto or towards y⁰ Mill river and they to have two thirds of theyre proportion in y⁰ tract." In December, 1680, the committee reported their scheme of allotment and it was voted that the western part of the town "should have their whole proportion together, and to begin to lay out as was formerly ordered at Mr. Malborn's Cove and So a long by y⁰ sea to Oyster river and thence upward by Milford line until they com at least half a mile above y⁰ round hills, but not to exceed one mile above those sd hills, and thence to turn eastward & lay out unto y⁰ Mill River, and if all y⁰ lots are not provided for by coming to y⁰ Mill river then to turne backe and lay out behind those lots already laid above y⁰ west rock, and toward Lebanon, but Lebanon Swamp not to be Laid out, always to lay out such land as they judge fit to be laid out according to y⁰ order of y⁰ 29th December 1679."

The want of any record of a report by the committee appointed to stake out commons, or of any action as to laying them out after 1675, leaves it uncertain not only whether any were ever staked out or laid out by proper authority, but whether the allotments in severalty made in 1680 were confined, as was ordered by the town, to lands incapable of improvement. It would be a *prima facie* presumption that the committee did their duty and that the allotments were so confined, but this would not avail the defendants if rebutted by other proof. It was fully rebutted by other proof, even if the land in controversy could be considered as of such a kind in 1680 that it was incapable of improvement and so not fit to be laid out, under the terms of the town orders. The undisputed fact that it was included in the allotment to Thomas Trowbridge established that it ceased to be common land in 1680; and, as has been already seen, there was no record evidence whatever that the Trowbridge title at any subsequent time became vested in either town.

In the face of the title in the plaintiff shown upon the face of the public records, the oral testimony as to reputation and declarations in support of a title in the town of Orange was of slight weight. The trial judge who heard all the testimony came to the opinion that it was of weight so slight that it ought not to go to the jury. His action ought not to be reversed unless there are reasonably strong grounds on which error can be predicated. *Loomis* v. *Perkins*, 70 Conn. 444, 447. Under all the circumstances of the case, we see no sufficient reason for a reversal.

In connection with the record evidence as to the claim of town commons above discussed, the trial court, in charging the jury, referred to the record of the town-meeting of December 27th, 1686, and the statement therein that "Henry Bristolls Lott was first which began as soon as y^e land would bear as y^e sizers adjudged wherin a considerable piece of Comons was left between y^e sd Bristoll's Lott & y^e Meadow, from which Comon was land allowed at least 4 rod wide by y^e seaside round to Oyster river mouth & soe at y^e reare of y^t teere of Lotts a highway from y^e Comon, down to sd Oyster river mouth between y^e sd teere of Lotts & Benjamin Bunnels Lott." This he instructed them described a highway not taken out of the common land but beginning at and running from it.

It was irregular thus to comment on this record in reference to its bearing on the question then under consideration, since it had been admitted solely with reference to the claim that the land in controversy was the site of a highway. Its exclusion for any other purpose had presumably prevented the defendants from making use of it in argument in support of their contention then under examination. They have, however, had that opportunity before us, and we are satisfied that the construction placed upon the paper by the trial judge was correct. The "Comon" referred to was plainly one lying between Henry Bristol's allotment and the meadow, and the meadow was on the easterly side of that allotment. The reason for leaving the "Comon" between the allotment and meadow was sufficiently explained by the

fact that Bristol's was the first allotment made, and no allotment was made of land which the "sizers" did not judge firm enough "to bear." A highway leading "from" this common land would not include it.

Such being the legal construction of the record, it is no cause of error that allusion was made to it as having that meaning, in the charge by the trial court. The only part of the charge, indeed, the correctness of which is of any materiality is the final direction to return a verdict for the plaintiff. It was unnecessary to explain to them the reasons why the direction was given.

Objection is made that the court misconstrued a mortgage deed given by E. B. Wilmot, one of the plaintiff's predecessors in title, in 1869, and the release of it to him, given in May, 1871. These deeds purport to convey about thirty-four acres of land and bound it " Easterly by highway." At these dates the road above the line of the old stone wall had been laid out by the town and was in use. The whole Wilmot farm, if bounded southerly or easterly on Long Island Sound, comprised about thirty-seven acres. If the trial court ruled that the calls of these deeds were satisfied by taking the easterly bound as on the new highway, it did not err. Whether it made such a ruling, however, is not shown in the record with sufficient distinctness to save the exception, if one was taken.

In disposing of the cause the court ruled that two of the ' defenses set up were claims of title of the same character. Each of these was of an estate in fee in the town of Orange, through title derived by the Act of incorporation from the town of New Haven, and a similar estate in the latter town since its formation; but in one of them was added a claim of immemorial possession, and also of title under the Walter Wilmot deed of 1846. A defense of adverse possession had been filed and then withdrawn. Mere possession, however long continued, unless exclusive and adverse, could be of no avail against the paper title established in the plaintiff, accompanied as it was by evidence tending to show actual· possession by him. The Walter Wilmot deed did not em-

brace the land in controversy. In substance, therefore, so far as the issues to be determined by the jury were concerned, the defenses were identical.

It is contended that in ruling that two of the claims set up in the answer were legally insufficient to support a verdict for the defendants, the trial judge erred, because, on demurrer, they had been decided by another judge to be sufficient. The former decision was not that they were sufficient, but that their sufficiency could not be attacked by demurrer. These, and several other of the " defenses " into which the answer is divided, were in the form of claims of title, followed by a specification in the shape of a recital of the sources of title from which they are derived. The claim was not the subject of an issue: the specification of the sources of title, if pleaded as an averment of fact, was. Whether it was so pleaded was questionable.

In the memorandum of decision filed by *Judge Thayer*, it is pointed out that the demurrer filed by the plaintiff, which was under consideration, reached back to the first fault in the pleadings, and that the complaint contained a mere claim of title without any allegation of title. If, however, any differences exist between the views set forth in his memorandum and those which induced later rulings of *Judge Gager*, the important question is not whether there was a difference, but which view was right. *Wiggin* v. *Federal Stock & Grain Co.*, 77 Conn. 507, 516.

Assuming that the answer alleged title and specified its source, it was the proper subject of demurrer or denial. The claim was an affirmative one. An assertion of title put forward in pleadings by either party must be supported, if attacked, whether it be challenged because unsound in law or untrue in fact.

In the arguments before us, counsel for the defendants sought to raise the point that it was not an undisputed fact that the land in controversy was included in the allotment made to Thomas Trowbridge in 1680. It is explicitly stated to have been such in the finding. No exception having been

taken to this statement, in connection with the appeal, it must stand as conclusive.

There is no error.

In this opinion the other judges concurred, except HAM-ERSLEY, J., who dissented.