[Civ. No. 3197. Second Appellate District, Division Two.—July 14, 1920.]

## S. C. SIMONS, Respondent, v. INYO CERRO GORDO MINING AND POWER COMPANY (a Corporation), et al., Appellants.

[1] WATERS AND WATER RIGHTS—OWNERSHIP OF SPRINGS ON PUBLIC LANDS—COMMON REPUTATION—EVIDENCE.—In an action to determine the ownership of the waters of certain springs situated on vacant public lands, it is prejudicial error to permit witnesses for plaintiff to testify, over defendant's objections, as to who, according to common reputation, was the owner of such springs, instead of requiring such witnesses to testify as to what the common reputation was, leaving the interpretation to be placed upon such common reputation to the jury.

[2] ID.—PRIVATE RIGHTS TO REAL ESTATE—EVIDENCE OF COMMON REPUTATION—APPLICATION OF COMMON-LAW RULE.—Subdivision 12 of section 1963 of the Code of Civil Procedure, which declares, as a *prima facie* or disputable presumption, "That a person is the owner of property from exercising acts of ownership over it, or from common reputation of his ownership," has not modified the common-law rule that evidence of common reputation is inadmissible to establish title to real estate where private rights only are affected.

[3] ID.—WATERS ON PUBLIC LANDS—PRIVATE CLAIMS—COMMON REPUTATION—EVIDENCE.—A claim made to any part of the public domain, or a claim to a right to take water from a stream or other source of water supply that is situated wholly on the public domain, affects the public and the public interest; therefore, evidence of common reputation is admissible to prove ownership of private water rights in or to waters that are situated wholly on or flow wholly over public lands. (On petition for hearing by supreme court, approval by that court withheld and question left open for further consideration.)

[4] ID.—EVIDENCE — COMMON REPUTATION — PERIOD OF EXISTENCE.—
Whenever common reputation of ownership is admissible upon the
ground that it establishes a claim that tends to disparage a public
right, the only reputation that is admissible, under subdivision 11
of section 1870 of the Code of Civil Procedure, is that respecting
facts of a public or general interest "more than thirty years old."

[5] ID.—SPRINGS ON VACANT PUBLIC LANDS—PRIVATE OWNERSHIP—
USUFRUCTORY RIGHT.—There cannot be a private ownership in
springs of water situated on vacant public lands, but merely a
usufructory right, and that right can be acquired only by an
"appropriation" made in the manner provided by law, that is, by
reducing the water to actual possession for a beneficial use.  (On
petition for hearing by supreme court, approval by that court re-
fused.)

[6] ID.—DISCOVERY OF SPRINGS—DEVELOPMENT OF WATER—APPROPRIA-
TION.—Mere discovery of springs on the public domain does not
give a right to divert or use any of the water, nor can mere
development of the water, unaccompanied by any actual diversion
for beneficial use, give any right, but it is only by some species
of "appropriation," i. e., reducing the water to actual possession,
made as provided by the act of Congress of 1866 (Rev. Stats.,
sec. 2339), that one can acquire title to a right in or to waters
situated or flowing wholly on public lands.

[7] ID.—ELEMENTS OF APPROPRIATION.—To constitute a valid appro-
priation of water, three elements must exist: an intent to apply
it to some existing or contemplated beneficial use; an actual
diversion from the natural channel by some mode sufficient for
that purpose; and an application of the water within a reasonable
time to some beneficial use.

[8] ID.—MODE OF DIVERSION.—As to the second element of a valid
appropriation, namely, that there must be an actual diversion, it
is the fact of diversion, and not its mode, that is material; and
any mode may be resorted to which, under the circumstances,
proves effective.

[9] ID.—APPROPRIATION—NECESSARY ACTS—INTENT—BENEFICIAL USE.
In appropriating the waters of a spring located on public lands,
only such acts are necessary, and such indications and evidences
of appropriation are required, as the nature of the case and the
face of the country will admit, and which, under the existing con-
ditions and circumstances, are practicable to accomplish the ap-
propriator's purpose in making a beneficial use of the water.

[10] ID.—WHEN APPROPRIATION COMPLETE—DIVERSION IN EXCESS OF
CONTEMPLATED USE—RIGHTS OF OTHERS.—If diversion is actually
made with intent to use the water for some useful purpose or
industry, the appropriation is then complete in the sense that
the rights of the appropriator cannot be defeated by acts done
or appropriation attempted to be made by others after such diver-

sion and while he is proceeding with reasonable diligence to apply the water appropriated by him to the purpose contemplated; but water in excess of such amount as is reasonably necessary for the contemplated use, though actually diverted and carried away, is not, in the legal sense, "appropriated," and still remains subject to appropriation and use by others.

[11] Id.—Title to Water Right—Proof by Common Reputation—Limitation of Evidence—Extent of Use.—Conceding that common reputation is admissible to ·establish title to a water right, such reputation should be confined to the right itself, whatever it may be, and not extended to the *corpus* of the water to which the incorporeal right may attach; that is, the most that can be shown by the witness is, in substance, that there is an ancient common reputation in the community relative to the diversion and use of the water for some beneficial purpose, stating what that reputation is.

[12] Id.—Pipe-lines on Public Lands—Nature of Right—Mode of Conveyance.—One who enters upon public land and constructs a pipe-line thereon, under a claim of ownership of a water right, is entitled to the protection afforded by the act of Congress of 1866 to the constructors of ditches and canals, that is, a right of way for such pipe-line is given by the government; and such right of way is real property, the sale or transfer of which must be evidenced by a written instrument.

[13] Id. — Spring Without Natural Outlet—Ownership of. — A spring may have no natural outlet, in which case the owner of the land in which it lies, under ordinary circumstances, owns the water as completely as he does the soil. (Opinion of supreme court, on denial of hearing.)

APPEAL from a judgment of the Superior Court of Inyo County. Wm. D. Dehy, Judge. Reversed.

The facts are stated in the opinion of the court.

A. H. Swallow, F. J. Hambly, S. E. Vermilyea and S. L. Carpenter for Appellants.

Richard S. Miner, P. W. Forbes, Louis Oneal, J. P. Sex and W. A. Lamar for Respondent.

FINLAYSON, P. J.—Defendants appeal from a decree adjudging plaintiff to be the owner of three springs of flowing and living waters, situated on vacant public lands of the United States in Inyo County, known, collectively, as the "Chris Crohn Springs," and located about four miles

northeasterly from the town of Cerro Gordo—formerly a prosperous mining camp.

The decree adjudges that plaintiff is the owner of each of the three springs, and of the right to divert all the waters thereof for domestic, culinary, household, drinking, mining, and milling purposes, and all other useful and beneficial purposes; that she is the owner of all the pipes, flumes, tanks, pumps, and other apparatus used to divert and conduct the waters of the springs to the town of Cerro Gordo; that none of the defendants has any right to any of the waters of any of the springs, or to the pipes, flumes, tanks, or pumps; that defendants be enjoined from hindering plaintiff from taking the waters of the springs at the outlets thereof, or from the pipes; and that plaintiff recover of and from defendants the sum of four thousand dollars, found by the court to be the amount of damages sustained by plaintiff by reason of the fact that, since October 17, 1916, defendants have prevented her from taking or using any water from the springs through or by means of the pipe-line that, by the decree, is declared to be her property. It is alleged in the answer that the defendant Cerro Gordo Mines Company is the owner of the right to divert and use all of the waters of the springs, and that it is the owner of the entire diversion system—the pipe-lines, pumps, tanks, etc.

Plaintiff claims title to the springs, and the right to divert and use all the waters thereof, as the successor in interest of one Chris Crohn, an old miner and prospector, who died about a year and a half before the trial. It appears from the evidence that in the early seventies Chris Crohn, upon whose acts plaintiff's asserted rights depend, conveyed water in kegs on mule-back from one of the three springs, the middle spring, to the mining camp at Cerro Gordo and there sold it by the gallon. There is no evidence that Crohn ever posted any notice of appropriation. There is no satisfactory evidence that he ever took any water from the most southerly of the three springs. At rare intervals, once in every thirty or sixty days, during a certain period of time, he took some water from the most northerly spring, the waters of which were not well adapted to domestic uses. This business of packing and selling water was continued by Crohn until the year 1882, when he and his wife left the district and moved to Mendocino County, in the northern part

of the state, where they remained for about eight years. During this period Crohn left· a person in charge of his properties and business at the Cerro Gordo camp, and he himself made occasional trips to the camp for the purpose of looking after his interests there. There is some evidence that prior to 1878 a small pipe was laid from the middle spring to a mine that subsequently was located by Crohn as the Auguste mine. It is not clear whether this old pipe was laid by Crohn to divert water from the middle spring, or whether it was installed by someone else. In fact, the evidence of the existence of this old pipe is not of the most satisfactory character.

In 1889 the Union Company, under whom defendant Cerro Gordo Mines Company claims, purchased the Cerro Gordo mine, and shortly thereafter purchased from three or four persons the rights which they claimed to have initiated by reason of certain appropriation notices theretofore posted by them at or near the springs. The Union Company never purchased from Crohn any right which he asserted in or to the springs. Immediately after purchasing the claims of these three or four persons, the Union Company, at a cost of about eight thousand dollars, built and installed a diversion system—pipe-lines, pumps, tanks, etc.—whereby it diverted water from the springs to Cerro Gordo. This is the diversion system that the lower court, in its decree, adjudged to be plaintiff's property. From its installation, in the fall of 1889, to the date of the trial, the diversion system so installed by the Union Company was used by it, and later by its successor, the Cerro Gordo Mines Company, to divert water from the springs to the town of Cerro Gordo. To sustain her claim to these pipes, pumps, tanks, etc., plaintiff relied upon the evidence of Chris Crohn's widow to the effect that in 1890, and shortly after the installation of these pipes, pumps, tanks, etc., by the Union Company, she overheard a conversation between that company's general manager and her husband, in the course of which the former told her husband that his company would pay her husband rent for such water as the company might divert from the springs, and if it did not, and the company should quit working, Crohn could have the pipe-lines, pumps, tanks, etc., for the rent of the water. Needless to say, it was only over

the vigorous objections of defendants' counsel that this evidence was admitted.

At all times subsequent to the installation of the system constructed by the Union Company, until enjoined by the lower court, that company, and its successor, the Cerro Gordo Mines Company, diverted and used water from these springs and devoted it to beneficial purposes. Defendants rely upon this diversion and use to establish the right of the Cerro Gordo Mines Company to take and use all the waters of the springs. Plaintiff, on the other hand, maintains that such diversion and use were with the consent of, and in subordination to the title of herself and her predecessor, Chris Crohn.

[1] To sustain her contention that her predecessor and grantor, Chris Crohn, was the owner of a right to take and use all the waters of these springs, plaintiff, over defendants' objection, was permitted by the court below to introduce the testimony of numerous witnesses that Crohn was the reputed owner of the springs. The questions propounded to each of these witnesses were all very much alike. Those propounded to the witness Pearl Castle will suffice for an example. After testifying that she first heard of the springs in June, 1908, when, for the first time, she visited the Cerro Gordo mining camp, the following questions and answers were propounded and given: "Q. Did there exist in that community at that time a common reputation as to the ownership of those springs? A. Yes, sir. Q. According to that common reputation, who was the owner of those springs? A. Chris Crohn." It will be noticed that this witness, who testified that when she first visited the springs there was a common reputation as to the ownership, was not asked what that common reputation was, but, instead, was asked who, according to that common reputation, was the owner of the springs —thus permitting the witness, instead of the jury, to place her interpretation upon the common reputation existing in the community regarding the ownership. We agree with appellants that these questions clearly were improper, and that in overruling defendants' objections thereto the lower court committed prejudicial error.

Under the common-law rules of evidence—rules founded on reason and the experience of ages—evidence of common reputation was confined to cases of pedigree, prescription,

48 Cal. App.—34

custom, boundary, and matters of general and public interest. Evidence of common reputation respecting private ownership or possession was inadmissible at common law, save where such ownership or possession favored or disparaged the existence of some public property right in which the whole community was interested, such as the public right in bridges, ferries, highways, public lands, *profits á prendre*, free warrens, and the like, and not even then unless the reputation was that of a past generation. (*Sexton* v. *Hollis*, 26 S. C. 231, [1 S. E. 893]; *Locklear* v. *Paul*, 163 N. C. 338, [79 S. E. 617]; *Goodson* v. *Brothers*, 111 Ala. 589, [20 South. 443]; *South School District* v. *Blakeslee*, 13 Conn. 228; *Dawson* v. *Town of Orange*, 78 Conn. 96, [61 Atl. 101]; *Twining* v. *Goodwin*, 83 Conn. 500, [Ann. Cas. 1912A, 845, 77 Atl. 953]; *Russell* v. *Stocking*, 8 Conn. 236; *Arthur* v. *Humble*, 140 Ky. 56, [130 S. W. 958]; *Johnson* v. *Turner* (Md.), 22 Atl. 1103; *Green* v. *Chelsea*, 24 Pick. (Mass.), 71; *Howland* v. *Crocker*, 7 Allen (Mass.), 153; *Wendell* v. *Abbott*, 45 N. H. 349; *Canfield* v. *Hard*, 58 Vt. 217, [2 Atl. 136]; *Spicer* v. *Spicer*, 249 Mo. 582, [Ann. Cas. 1914D, 238, and notes on p. 244, 155 S. W. 832]; 2 Wigmore on Evidence, sec. 1580 et seq.; Jones on Evidence, sec. 305; 16 Cyc. 1210. See, also, *Berniaud* v. *Beecher*, 76 Cal. 394, [18 Pac. 598].) In *Sexton* v. *Hollis, supra,* the general rule and its exceptions are thus stated: "Common repute is nothing more than the prevailing belief in a certain community, and to allow that to be adduced as evidence upon an issue of title would be to establish the belief or opinion of the community for that of the jury called on to pass upon such issue. The question is, what do the jury believe, and not what is the generally received opinion in the neighborhood; and the belief of the jury must be found from the legal and competent testimony adduced in the case. This class of testimony falls under the head of hearsay evidence, which, as a general rule, is clearly incompetent. It is true that there are certain well-recognized exceptions to this rule, which in several of the cases are said to be as old as the rule itself; but we do not think that this case comes within any of these exceptions, which are confined to cases of pedigree, of prescription, of custom, and in some cases of boundary, and also matters of general and public history." For reasons presently to be stated, we think that

the instant case falls within one of the uniformly recognized exceptions to the general rule. That is, we think that Crohn's reputed ownership presented a matter of general and public interest.

[2] We do not agree with respondent's claim that subdivision 12 of section 1963 of the Code of Civil Procedure has modified the common-law rule that evidence of common reputation is inadmissible to establish title to real estate where private rights only are affected. By that code section it is expressly declared that, among the *prima facie* or disputable presumptions enumerated therein, is this: "That a person is the owner of property from exercising acts of ownership over it, or from common reputation of his ownership." The only provisions of our Code of Procedure that have any bearing upon the question of proving title by common reputation are the code provision already quoted (subd. 12, sec. 1963), and subdivision 11 of section 1870, which reads: "In conformity with the preceding provisions, evidence may be given upon a trial of the following facts: . . . 11. Common reputation existing previous to the controversy, respecting facts of a public or general interest more than thirty years old, and in cases of pedigree or boundary." These two code provisions should be read together. What was said in *Estate of Heaton,* 135 Cal. 386, [67 Pac. 321], and *Estate of Mills,* 137 Cal. 302, [92 Am. St. Rep. 175, 70 Pac. 91], about reading together subdivision 11 of section 1870 and section 1852, is equally applicable here. When subdivision 12 of section 1963 and subdivision 11 of section 1870 are read together, as they should be, it is clear, we think, that the former contemplates but a restatement of the common-law rule. One of these two code provisions (subd. 11, sec. 1870) declares when and in what cases evidence of common reputation is admissible; the other (subd. 12, sec. 1963) declares what is the effect of such evidence when properly admitted. By subdivision 12 of section 1963 the legislature did not intend to declare that evidence of common reputation of ownership is admissible as *prima facie* evidence of title in any and every case where title to property is an issue. It does not pretend to say when evidence of common reputation may be admitted. It only declares the effect of its admission. All it does, in effect, is to declare that when, under other code provisions,

common reputation is admissible, the effect of its admission is to raise a *prima facie* presumption of ownership. To illustrate, it always has been the rule that when title to real estate is only collaterally involved, parol evidence, such, for instance, as common reputation of ownership, is admissible (*Shanks* v. *Robertson,* 101 Kan. 463, [1 A. L. R. 1140, and notes on p. 1143, 168 Pac. 316]); and, of course, if, in such a case, such evidence of common reputation is received, its effect is as declared in subdivision 12 of section 1963, i. e., it raises a *prima facie* presumption of ownership. But to hold that, where title is a direct issue and is of such a character that a claim thereto can in nowise affect the public or its interests, evidence of common reputation of ownership is admissible, would countenance a rule that easily could be turned to the accomplishment of great wrong and injustice, and titles would be won and lost as neighborhood gossip veered with the ever-changing feelings of friendliness or hostility toward the rightful claimant. *Berniaud* v. *Beecher,* 76 Cal. 394, [18 Pac. 598], seems to be the only case in this state that touches the question. Though the question did not receive much discussion there, it clearly appears from the briefs filed on the petition for a rehearing that the point was directly raised, and was decided in accordance with the foregoing views.

But, though the general rule is that evidence of common reputation of ownership is inadmissible, under the code as at common law, where private property rights only are affected and matters of general or public interest are not involved, nevertheless such evidence may properly be received where the title sought to be established affects public property rights in such a way as to be a matter of public or general interest, and the reputation is ancient. A distinction has long been recognized between public and private rights and the admissibility of hearsay evidence with respect thereto. The interest which the members of a community possess in their common rights is so great that judicial administration has assumed that it is sufficient to insure such general discussion and mutual correction as to give some probative value to a common reputation that affects such rights. (4 Chamberlayne on Evidence, sec. 2741.) Accordingly, where a foundation is laid, by acts of ownership, reputation becomes admissible where the claim tends to

abridge the public right, and the reputation is ancient, i. e., is that of a past generation, or, as said by our code (subd. 11, sec. 1870), respects facts of a public or general interest "more than thirty years old." (*Russell* v. *Stocking,* 8 Conn. 236; *Dawson* v. *Town of Orange,* 78 Conn. 96, [61 Atl. 101]; *Morse* v. *Whitcomb,* 54 Or. 412, [135 Am. St. Rep. 832, 102 Pac. 788, 103 Pac. 775]; Chamberlayne on Evidence, sec. 2743; Wigmore on Evidence, secs. 1582, 1586.) Speaking of proof of title by common reputation in cases where the public interest necessarily is affected by the claim of private ownership, the Connecticut court, in *Russell* v. *Stocking, supra,* said: "A foundation being laid, by acts of ownership, reputation becomes admissible; particularly where the claim tends to abridge a public right. 'For all mankind,' says Lord Kenyon, 'being interested, it is natural to suppose that they will be conversant with the subject, and discourse about it, having all the same means of information.' "

[3] A claim made to any part of the public domain, or a claim to a right to take water from a stream or other source of water supply that is situated wholly on the public domain, necessarily affects the public and the public interest. For that reason we are inclined to the view that the rule that common reputation of ownership is admissible where the claim tends to abridge a public right is applicable to private claims to public lands and to private water rights in or to waters that are situated wholly on or flow wholly over public lands. One of the chief concerns of those early adventurers who sought to exploit the wealth of our wild lands was to make themselves acquainted with the rights and claims of those around them. Frequently such claims were not only the familiar topic of their conversations, but the all-absorbing topic. We are inclined to the view, therefore, that the reason for the admission of evidence as to the common reputation of ownership of bridges, highways, and the like, applies with equal force to claims to public lands and to water on such lands. This view seems to have received the sanction of our supreme court in *Vernon I. Co.* v. *Los Angeles,* 106 Cal. 237, where the court, on page 254, [39 Pac. 762, 768], said that it was proper to show that it was a matter of common reputation, more than thirty years old, that the city of Los Angeles claimed the water and had

control over it. In this connection the court said: "It.was proposed to show that the city had used the water under a claim of right. It was proper to show this, and, as it was a matter of general interest,. and, as to a portion of the time, of ancient date, and the declarants dead, it could be established by proof of the prevailing current of assertion. (Greenleaf on Evidence, sec. 128.)" It would also seem that this view of the law meets with the approval of Mr. Chamberlayne, who, in a paragraph devoted to the admissibility of evidence of common reputation when the public interest is affected, says: "Whether certain lands are public or owned by private individuals may properly be a subject of general concern to the members of a community." (4 Chamberlayne on the Modern Law of Evidence, sec. 2803, citing *Dawson* v. *Town of Orange, supra.*) What is said in *Harriman* v. *Brown,* 8 Leigh (Va.), 708, and *McKinnon* v. *Bliss,* 21 N. Y. 218, also lends support to this view, though those cases presented questions of boundary only.

We have deemed it our duty to give this question this somewhat exhaustive consideration, not only because of its intrinsic importance, but also because the admissibility of common reputation respecting the ownership of a right in and to waters of these springs will, without doubt, arise on the retrial, and it is our duty to determine all questions of law necessary to a final determination.

Though we believe and hold that, for the reasons we have stated, it is proper to admit evidence of common reputation respecting the existence of a right to divert and use waters that are wholly situated on the government's vacant public lands, still, for reasons about to be stated, we are constrained to hold that the questions as propounded by respondent's counsel to establish Crohn's title by common reputation were fatally defective in form. The questions, in the form in which they were cast by plaintiff's counsel, were objectionable in at least three particulars.

[4] 1. In the first place, whenever common reputation of ownership is admissible upon the ground that it establishes a claim that tends to disparage a public right, the only reputation that is admissible under the common law rule is that of a past generation (*Dawson* v. *Town of Orange, supra;* 2 Wigmore on Evidence, sec. 1582); or, as our code provides, the reputation must respect facts of a public or

general interest "more than thirty years old." Not only
was the reputation as testified to by many of the witnesses in
the court below a recent reputation—a reputation based upon
the statements of living, not deceased, persons—but the re-
puted ownership itself was of recent date, that is, it was not
shown to have been a reputed ownership existing more than
thirty years before the trial. The questions, as framed,
called neither for an ancient reputation nor for a reputed
ownership more than thirty years old. Thus, for example,
the witness Pearl Castle, who visited the Cerro Gordo
mining camp and first heard of the springs about nine years
prior to the trial, was asked, over appellants' objection,
whether there did not exist in the community "at that
time"—nine years before the trial—a common reputation as
to the ownership of the springs.

2. By many of the questions the witnesses were asked, not
what was the common reputation as to the ownership of a
right to take and use water from the springs, but what was
the common reputation as to the ownership of the springs
themselves. And many, if not all of the witnesses, in
reply to such questions, said that Chris Crohn was com-
monly reputed to be the owner of the springs—not that he
was commonly reputed to be the owner of a *right,* viz., the
right to take water from the springs. Such evidence could
not possibly throw any light upon the real question pre-
sented by the case, which was this: Is this plaintiff, as
successor of Chris Crohn, the owner of a water right, i. e., a
right to take and use water from the springs? And if she
is, then what is its extent? Has she the right to take all
or only part of the waters of the springs? [5] There no
more could be private ownership in the springs themselves
than there could be private ownership in the *corpus* of a
stream of running water. There could be but a usufructory
right. And that right could be acquired only by an "ap-
propriation" made in the manner provided by law, that is,
by reducing the water to actual possession for a beneficial
use.

The vice of the questions, in the form in which they were
cast by examining counsel, will clearly appear if we pause to
consider some of the elementary rules governing the acquisi-
tion of water rights on the public domain. Counsel for re-
spondent seem to think that Chris Crohn could and did ac-

quire title to the springs by right of discovery, and also by developing the water of the springs—it seems that Crohn, or someone, ran a short tunnel into the hillside where the waters from one or more of the springs bubble up from the earth, and also constructed a sump near one of the springs into which the waters collected. [6] Mere discovery of the springs could not give a right to divert or use any of the water. Nor could mere development of the water, unaccompanied by any actual diversion for beneficial use, give any right. It is only by some species of "appropriation," i. e., reducing the water to actual possession, made as provided by the act of 1866 (Rev. Stats., sec. 2339 [9 Fed. Stats. Ann., 2d ed., p. 1349; U. S. Comp. Stats., sec. 4647]), that one can acquire title to a right in or to waters situated or flowing wholly on public lands. The federal government, as proprietor of the public domain, early recognized the necessity of permitting persons in these arid regions to acquire an interest in water sources on public lands distinct from the lands themselves; and in 1866 (14 Stats. 253; Rev. Stats., sec. 2339), Congress passed an act which provides, among other things, as follows: "Whenever by priority of possession, rights to the use of water for mining, agricultural, manufacturing or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same." By the act of July 9, 1870 (16 Stats. 218; Rev. Stats., sec. 2340 [9 Fed. Stats. Ann., 2d ed., p. 1360; U. S. Comp. Stats., sec. 4648]), it was further provided: "All patents granted, or pre-emptions or homesteads allowed, shall be subject to any vested and accrued water right, or right to ditches and reservoirs used in connection with such water rights as may have been acquired under or recognized by the preceding section." It will be noticed that the language of the act of 1866 is: "Whenever by priority of possession, rights to the use of water . . . have vested," etc. The right is the right to the "use," and it can be acquired only by "priority of possession," i. e., by actual diversion with a bona fide intent to use the water for a beneficial purpose. In Kelly v. Natoma Water Co., 6 Cal. 105, it was said that "possession or actual appropriation must be the test of priority in all claims to the use of water,

whenever such claims are not dependent upon the ownership of the land through which the water flows.'' [7] To constitute a valid appropriation of water, three elements must always exist: (1) An intent to apply it to some existing or contemplated beneficial use; (2) an actual diversion from the natural channel by some mode sufficient for the purpose; and (3) an application of the water within a reasonable time to some beneficial use. (*Low* v. *Rizor,* 25 Or. 551, [37 Pac. 82]; *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59, [60 Am. St. Rep. 777, and notes on pp. 799 et seq., 45 Pac. 472].) [8] As to the second element of a valid appropriation, namely, that there must be an actual diversion, it is the fact of diversion, and not its mode, that is material. Ordinarily, a diversion is accomplished by a ditch, canal, pipe-line, and the like; but any mode may be resorted to which, under the circumstances, proves effective. (60 Am. St. Rep. 806.) [9] In appropriating the waters of a spring located on public lands, only such acts are necessary, and such indications and evidences of appropriation required, as the nature of the case and the face of the country will admit, and which, under the existing conditions and circumstances, are practicable to accomplish the appropriator's purpose in making a beneficial use of the water. The third, and perhaps the most essential, element to the legal appropriation of water is its application within a reasonable time to some useful purpose of industry. [10] It is, perhaps, not strictly true that this application is essential to the appropriation; for if diversion is actually made with *intent* to use the water for such purposes, the appropriation is then complete in the sense that the rights of the appropriator cannot be defeated by acts done or appropriations attempted to be made by others after such diversion and while he is proceeding with reasonable diligence to apply the water appropriated by him to the purpose contemplated. Water in excess of such amount as is reasonably necessary for the contemplated use, though actually diverted and carried away, is not, in the legal sense, ''appropriated,'' and still remains subject to appropriation and use by others. Crohn's appropriation was not by the statutory mode provided in the Civil Code; that is, he did not post any notice of appropriation. His water right, therefore, if any he ever had, could not exceed the greatest amount of water ever actually taken by him and applied to a beneficial use or uses prior to the time when others ap-

propriated waters from the springs. (*Smith* v. *O'Hara*, 43 Cal. 371; *Southside Imp. Co.* v. *Burson*, 147 Cal. 401, [81 Pac. 1107]; *De Necoched* v. *Curtis*, 80 Cal. 397, [20 Pac. 563, 22 Pac. 198].) Actual diversion (the taking of possession) creates the right; actual use (the amount in possession) measures the right. As said by Judge Hawley in *Union Min. Co.* v. *Dangberg*, 81 Fed. 73: "In the appropriation of water there cannot be any 'dog in the manger' business by either party."

If, now, we apply to this case the foregoing elementary principles relative to the acquisition of water rights by "appropriation," it will readily appear why it was improper to permit respondent to ask her witnesses if, according to common reputation, her predecessor in interest, Chris Crohn, was the owner of the springs themselves. It appears from the evidence that at no time did any of the uses to which Crohn put the waters reasonably require all the water flowing from the three springs. Years ago, when the camp had its greatest population, fifteen hundred to two thousand inhabitants—it since has dwindled almost to the proportions of a deserted camp—Crohn used no more than about three hundred gallons a day, packed on mule-back into the town of Cerro Gordo. The total flow from the springs is about three miner's inches, or considerably more than ever was reasonably necessary to satisfy the beneficial uses to which Crohn at any time devoted the water that flows from the springs. If, therefore, he ever acquired a water right, it was the right to use an amount much less than the total flow from the three springs. [11] It follows, therefore, that if, as we hold, common reputation is admissible to establish title to a water right, such reputation should be confined to the right itself, whatever it may be, and not be extended to the *corpus* of the water to which the incorporeal right may attach. That is, the most that can be shown by the witness is, in substance, that there is an ancient common reputation in the community relative to the diversion and use of the water for some beneficial purpose, stating what that reputation is. To ask the witnesses to state who was reputed to be the owner of the springs, as was done by counsel for the plaintiff in this case, could only mislead. There can be no ownership of the springs; there can only be ownership of a right to take and use water from the springs. In taking

leave of this particular aspect of the general subject of proof of title by common reputation, we cannot refrain from expressing the belief that, in the very nature of things, the establishment of a water right by evidence of common reputation never can prove satisfactory. At best, evidence of a common reputation as to the ownership of such a right can have little, if any, probative force. This is so because the exact nature and extent of a right to divert and use water from a source of supply on public land frequently depends, not only upon a multiplicity of facts, but upon a nice application of those facts to legal principles with which the average layman has no acquaintance.

3. The questions propounded to respondent's witnesses were objectionable upon the further ground that they left it to the witnesses instead of the jury to interpret the reputation that existed in the community. The questions were not confined to asking the witnesses to tell what was the common reputation about which they were called to testify. They, or some of them at least, were asked who, according to the reputation as to ownership, was the owner. As framed by the examining counsel, the questions, in effect, required the witnesses to usurp the functions of the jury. As said in *Wilson* v. *Maddock*, 5 Or. 482: "The proper fact to be proven was merely the common reputation. Of this alone the witness was competent to testify. The inference or presumption to be drawn from that fact was matter for the jury."

For these reasons we are satisfied that the lower court erred in overruling appellants' objections to the questions whereby respondent sought to prove ownership of the springs by common reputation, and that such error was clearly prejudicial.

[12] The lower court erred, also, in finding and adjudging that respondent is the owner of the pumps, pipe-lines, tanks, etc., installed in the fall of 1889 by the Union Company, the predecessor of the Cerro Gordo Mines Company. Not only does the complaint fail to allege that plaintiff owns the pumps, pipe-lines, tanks, etc., but there is no competent evidence to sustain the finding that they are owned by plaintiff. As already stated, Chris Crohn, in 1882, left the mining camp for Mendocino County, where he resided until his return to Cerro Gordo in 1889, or about the time when

the Union Company installed its diversion system. It was not until 1890 that Mrs. Crohn returned to Cerro Gordo from their home in Mendocino County. The lower court, over the objection of defendants, permitted Crohn's widow to testify that, on her return to Cerro Gordo in 1890, she overheard a conversation between her husband and the general manager of the Union Company to the effect that the company would pay Crohn one and one-quarter cents per gallon for all water it might take from the springs through its diversion system, and that, if the company should quit working without thus paying for the water, Crohn might have the pipe-lines, pumps, and tanks. This, conceded by respondent to be the sole evidence upon which to base a finding that plaintiff is the owner of the pumps, pipe-lines, and tanks, was wholly insufficient for that purpose. In the first place, there is no evidence that the Union Company's general manager had any authority thus to dispose of his company's real property. In the next place, the pipe-lines and the right of way therefor were realty, title to which could not pass by parol. There is no allegation or evidence of any equitable estoppel; and if plaintiff, as' Crohn's successor, is entitled to the pipe-lines, etc., installed by the Union Company in 1889, and the right of way therefor, it is only by reason of what, according to Crohn's widow, was said to her husband by the general manager of that company in 1890 in the course of the conversation to which we have just adverted. But title cannot be so established.

One who enters on public land and constructs a pipe-line thereon, under a claim of ownership of a water right, is entitled to the protection afforded by the act of 1866 to the constructors of ditches and canals. That is, a right of way for such pipe-line is given by the government. (*San Jose L. & W. Co.* v. *San Jose Ranch Co.*, 189 U. S. 177, [47 L. Ed. 765, 23 Sup. Ct. Rep. 487, see, also, Rose's U. S. Notes].) Such right of way is real property; and one who enters into possession thereof under a verbal sale does not succeed to the legal title. The sale must be evidenced by a written instrument. (*Smith* v. *O'Hara,* 43 Cal. 371.) To this, the only reply vouchsafed by respondent is that the Cerro Gordo Mines Company is, and its predecessor, the Union Company, was, a trespasser. In the first place, even if the Union Company never acquired any water right, and even if, as against

the federal government, the laying of the pipe-lines through, and the construction of the tanks and pumps upon, the vacant public lands was a trespass, still, as between plaintiff and defendants, the former would not, for that reason, be entitled to the pipe-lines, pumps, etc. But, as a matter of fact, neither the Union Company nor the Cerro Gordo Mines Company was a trespasser, either at the springs or in those parts of the vacant government lands wherein and whereon its diversion system was installed. This is so for the reason that, even if Crohn did acquire a water right, it was not a right to take all the waters of the springs. According to plaintiff's own showing, Crohn never used more than a part of all the spring waters. The surplus, therefore, which would run to waste if not put to some beneficial use, was subject to appropriation by the Union Company, or by anyone who chose to initiate a right thereto by availing himself of the privilege granted by the act of Congress of July 26, 1886, namely, by appropriating such surplus in a manner "recognized and acknowledged by the local customs, laws, and the decisions of the courts."

For these reasons the judgment must be reversed and the cause remanded for retrial. As it is unlikely that the many other assignments of error pressed upon our attention by appellants will arise at the second trial, they do not require detailed consideration.

Judgment reversed.

Thomas, J., and Weller, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 10, 1920, and the following opinion then rendered thereon:

THE COURT.—The petition for rehearing is denied.

We withhold our approval from the statement in the opinion of the district court to the effect that evidence of common reputation is admissible to prove ownership of a private claim to take water flowing upon public lands. We consider it extremely doubtful if the rule stated in subdivision 11, section 1870 of the Code of Civil Procedure, allowing such evidence "respecting facts of a public or general in-

terest more than thirty years old'' extends to such private claims to a part of the lands of the United States, and we prefer to leave the question open for further consideration.

We also refuse to approve the broad statement that there cannot be a private ownership in springs of water. The case is not parallel to the question of the ownership of the water of a stream. [13] A spring may have no natural outlet, in which case the owner of the land in which it lies, under ordinary circumstances, owns the water as completely as he does the soil.

All the Justices concurred.