[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant case concerns the location of a common boundary line in North Branford. Pursuant to General Statutes § 47-31, the plaintiff Gerald Fischbach has brought an action to quiet title. Subsection (d) of 47-31 requires each defendant to state the nature and extent of his or her interest in the disputed property and the manner in which such interest was derived: The defendants Anthony and Dorothy Walker, husband and wife claim ownership of the disputed parcel by virtue of a deed from their predecessors in title. The plaintiff claims ownership pursuant to a deed from his mother. Since both sides assert ownership solely because of deeded titles, the doctrine of adverse possession, a feature in many quiet title actions, is not involved in this case.
At the trial, the court heard testimony from the plaintiff, the defendant Anthony Walker and their respective witnesses. CT Page 1412-QQ Several documentary items were placed in evidence. The court also walked the two lines, one claimed by the plaintiff and the other claimed by the defendants to be the true boundary, in the presence of the plaintiff, the defendant Dorothy Walker, and their respective attorneys and surveyors. From the evidence including established.
 I.
The plaintiff received his title on September 14, 1987 in a quitclaim deed from his mother Friederike Fischbach. Friederike had shared the ownership with her deceased husband, the plaintiff's father Ferdinand Fischbach, as joint tenants with the right of survivorship. Ferdinand had placed the property in joint tenancy on January 20, 1964. Ferdinand acquired the property from John Wittmer on October 24, 1949. John Wittmer acquired it from Mary Abt on the same day.
The deeds from Abt to Wittmer and from Wittmer to Ferdinand Fischbach not surprisingly contain the same description for the land conveyed.
North by Highway known as West Lake Road;
 East in part by said West Lake Road and land now or formerly of Willard R. Scranton;
 South by land now or formerly of George F. Schwidtal, et al.;
 West by land of George F. Schwidtal, et al now or formerly.
The descriptions of the boundaries in the deed from Friederike Fischbach to the plaintiff on September 14, 1987 are a seeming result of a surveyor's activities. On that date, she conveyed part of her North Branford holdings to the plaintiff and part to his brother, her other son Robert M. Fischbach. In relevant areas, however, the descriptions of boundaries in the deed from Friederike to the plaintiff are consistent with the descriptions in the deeds from Mary Abt to John Wittmer and from John Wittmer to Ferdinand Fischbach. Thus, in the deed from Friederike to the plaintiff, the following descriptions of boundaries appear:
North and Northwest by West Pond Road, CT Page 1412-RR formerly known as West Lake Road;
 West by land now or formerly of land now or formerly of George F. Schwidtal, et al;
 South by land now or formerly of George F. Schwidtal, et al;
 North again by land conveyed by the grantee to Robert M. Fischbach, 208 feet by a straight line which forms on exterior angle of 84 degrees, 30 minutes with the westerly line of land now or formerly of Willard R. Scranton at a point therein distant Southerly 160 feet from the Southerly line of West Pond Road when measured along the Westerly line of land now or formerly of Willard R. Scranton, the street line of West Pond Road is assumed to be 25 feet Southerly of the center line of the traveled (sic) portion of West Pond Road.
The further descriptions of East again, North again and East again refer to boundaries of the plaintiff's land with land conveyed by Friederike to Robert. These boundaries are not involved in the present dispute.
The defendants' chain of title starts with a warranty deed from George H. Schwidtal to Lawrence R. Marjan and Eva C. Marjan executed on September 15, 1948. As there is no mention of survivorship in the deed, the grantees presumably received title as tenants in common. The deed stated that four and one-half acres was conveyed the boundaries of which were:
 Northwesterly by West Pond Road, 210 feet more or less;
 Northerly by land of Mary Abt, 1100 feet more or less;
 Easterly by land of the Grantor, 154 feet more or less;
 Southerly by land of the Grantor, 550 feet more or less;
CT Page 1412-SS
 Easterly again by land of the Grantor, 110 feet more or less; and
 Southerly again by land of the Grantor, 550 feet, more or less, as the fence posts now stand.
The description of "land of Mary Abt" as the northern boundary is in error. A correct description would be that the land of Mary Abt bounds the property conveyed by Schwidtal to the Marjans 1100 feet on the east. Also from evidence introduced by the defendants, George H. Schwidtal, the grantor of Lawrence R. Marjan and Eva C. Marjan, and George F. Schwidtal, mentioned in the plaintiff's chain of title as the westerly and southerly boundary is found to have been the same person.
In 1977, Lawrence Marjan was an old man who wanted to sell his property and move to Florida. He engaged Stephen Hanchuruck a registered land surveyor to prepare a survey. At the time Hanchuruck was employed as a surveyor on a full-time basis by the Connecticut Highway Department and did private work such as the Marjan survey on Saturdays. Hanchuruck began his work on the Marjan survey in May, 1977.
When preparing a survey, the first thing a surveyor should do is examine the deeds of record of the subject property and the abutting landowners. Hanchuruck found that the deeds he examined in the Marjans' chain of title and in their abutters' chains, were vague meaning either that boundaries were not described by metes and bounds or by monuments. One deed examined by Hanchuruck was from Mary L. Gahan, executrix under the will of James Gahan, dated May 29, 1913, whereby three parcels were conveyed to George F. Schwidtal, Hugo E. Schwidtal and Ottelia F. Schwidtal. In the executrix' deed, the three parcels are described only by an amount of acreage, more or less, and the names of burdening land owners. The land conveyed by "George H. Schwidtal" to Lawrence and Eva Marjan comes from the executrix' deed. Among the other deeds examined were the deeds in the plaintiff's chain from Mary Abt to John Wittmer and from John Wittmer to Ferdinand Fischbach executed on October 24, 1949. From these deeds, he was able to conclude that the northerly bound in the deed from Schwidtal to the Marjans was, in terms of compass directions, incorrect.
Lawrence Marjan walked the supposed boundaries of his property CT Page 1412-TT with Stephen Hanchuruck and pointed out what he claimed were monuments. Hanchuruck testified that the most important sources for his survey map were Marjan's pointing out the boundary line and the reference to fence posts in the Schwidtal to Marjan deed. In particular, Hanchuruck recalled Lawrence Marjan pointing out a cairn and a hickory tree as being boundary markets.
Hanchuruck's survey map dated June, 1977 is one of the exhibits in the case. Reference to it as "a certain map entitled `Property of Lawrence R. and Eva C. Marjan, West Pond Road, North Branford, Connecticut, dated June, 1977' on file in the North Branford Town Clerk's Office by the map volume 9 at page 9" appears in the subsequent Marjan conveyances to the defendants and in a deed to others who have no common boundaries with the plaintiff. In deeds to the defendants from Stephen W. Whalen acting pursuant to a power of attorney from Eva C. Marjan, dated November 5, 1986, from Eva C. Marjan, herself, dated in December, 1986 and from Eva C. Marjan, as executrix under the will of Lawrence R. Marjan, dated December 24, 1986, the boundary between the former Marjan property and the Fischbach land to the east is described as follows:
 EASTERLY: 35.37 feet by land now or formerly of Ferdinand Friederike Fischbach, as shown on the hereinafter mentioned map;
 NORTHERLY: 42.80 feet by land now or formerly of Ferdinand Friederike Fischbach, as shown on said map;
 EASTERLY: again, 169.84 feet by land now or formerly of Ferdinand Friederike Fischbach, as shown on said map;
 NORTHERLY: again, 83., 35 feet by land now or formerly of Ferdinand Friederike Fischbach, being a broken line, as shown on said map;
 EASTERLY: again, 404.29 feet by land now or formerly of Ferdinand Friederike Fischbach, as shown on said map;
 SOUTHERLY: 66.84 feet by land now or formerly of Ferdinand Friederike Fischbach, as shown on said map;
 EASTERLY: again, 510.72 feet in part by land now or formerly of Ferdinand Friederike Fischbach, and in part by land now or formerly of Stelco Industries, as shown on said map.
CT Page 1412-UU
Before constructing their house, the defendants had to submit a plot plan to municipal authorities. They hired David Bragg civil engineer and surveyor and he prepared such a plan dated June 26, 1987. The defendants' house was constructed further west than originally planned because of the topography of the ground. Later on March 13, 1989, David Bragg prepared a revised plot plan showing the house as built to answer questions raised by North Branford's wetlands officer. In preparing his original and revised plot plans, Bragg did not do a boundary survey. Rather, he relied on the survey that was done by Stephen Hanchuruck. The lower left corners of both plot plans contains a notation designated "Refrence [Reference] Map" and underneath it the words "Property of Lawrence R. and Eva C. Marjan, West Pond Road, North Branford, CT Scale 1" = 40' Dated June 1977 by S.A. Hanchuruck." On the right side of the revised plot plan under the designation "Notes" the following inter alia appears:
 1. Boundary Shown Reproduced In Total From Reference Map Prepared By S.A. Hanchuruck L.S. Entitled Property of Lawrence R. And Eva C. Marjan-West Pond Road, North Branford, CT Scale 1" = 40' Dated June 1977.
 2. Portion of Old Fence Line Claimed To Be Easterly Property Line By Fischbach, As Shown In The Field To Anthony Walker On July 27, 1987.
In addition to preparing the defendants' plot plans, Bragg had performed survey work for the developer of the Marjan property specifically in flagging points on Hanchuruck's map in 1986 before the defendants' purchase.
Hanchuruck's survey was recorded on September 1, 1977. The plaintiff, however, had no actual knowledge of it or of its content until some years later. He had hired a company in 1987 to cut some trees. Personnel from that company in checking land records in the North Branford town clerk's office discovered the survey and gave the plaintiff a copy of it. The plaintiff telephoned Hanchuruck and complained about the description of the common boundary. The call was made in 1987 a few weeks after the death in Florida of Lawrence Marjan. Hanchuruck told the plaintiff to get his own help. The plaintiff hired David Bragg. CT Page 1412-VV
The plaintiff's claims concerning the boundary stem from growing up on the property where his father made burlap bags and raised cattle and later chickens. In the portion of the disputed area closer to West Pond Road there is a cliff that the plaintiff recalled his father fenced off from the grazing cattle. In the late 1950's or early 1960's, the plaintiff's father constructed two chicken coops near the disputed area and alongside them fences composed of wooden posts and box wire to provide ranges for the chickens. The two coops supplemented by a third erected elsewhere on the property at one time housed 15,000 chickens. Presently, the plaintiff lives in one of the former coops near the disputed area. Remnants of the fencing are still there. The sum of the plaintiff's contentions is that Hanchuruck and/or Lawrence Marjan mistook these fences and some stone walls for boundary markers when they are only evidence of former rural occupations on property that now belongs to him. According to the plaintiff, the true boundary line is further west in a fairly straight line which runs in its northerly portion on top of the cliff and on which appears the remains of old wire fencing, some of it barb, deeply embedded in mature trees. The plaintiff testified that he had often walked this line with his father and that to his knowledge, the line had never been questioned by John Wittmer or George Schwidtal.
In 1990 David Bragg did a survey of the plaintiffs property. Shown to him by the plaintiff was the line that the plaintiff considered to the westerly boundary of his property. Bragg recalled that there was a row of trees and remnants of old wire that could be seen protruding from tree trunks along the westerly bound of the area now in dispute. Bragg said that while he did not feel that the plaintiff's evidence was conclusive, there were remnants of wire fencing all along the westerly line. A recommendation from Bragg was that the plaintiff should engage the services of Warren Fisher, a licensed surveyor, who specializes in locating disputed boundary lines. The plaintiff followed Bragg's advice.
Warren Fisher started his work for the plaintiff by researching the titles of the litigants back to the 1700s. The research indicated that the division line had existed from that period. Then Fisher began his field work utilizing David Bragg's survey for the plaintiff dated June 8, 1990, and Stephen Hanchuruck's survey for Lawrence R. and Eva C. Marjan dated June, 1977, and the deeds in each chain of title. He prepared a written report, dated May 29, 1992 accompanied by a not-to-scale drawing CT Page 1412-WW which identified the disputed area as 1.34 acres.
In the drawing the westerly boundary line pointed out to David Bragg by the plaintiff is divided into sections referred to as Line A, Line B and Line C. The more easterly line pointed out to Stephen Hanchuruck by Lawrence Marjan is likewise divided into sections and labeled Line D, Line E, Line F, Line G, Line H and Line I. Line J is a line running from the boundary favored by the plaintiff easterly and northerly into the disputed area to the base of the cliff.
On Line A, Fisher located the remains of a wire fence on post remnants and trees running along the top of a ridge. The wire remnants were at least six or more strands of barb wire, twisted strand wire and single strand wife of varying lengths. This "fence line" continues for about 270 feet, the last 100 feet running along the remains of a stone wall. Line B is a continuation of Line A continuing north along the top of the ridge. For approximately the first 100 feet, Line B runs along the remains of a stone wall and then it continues over the top of a knoll running about 270 feet more to a stump. Only the remains of wire fencing is in existence for the 270 feet. Line C starts at the stump and runs approximately 30 feet down the north side of the knoll along the remains of to wire fence and a stone wall to the south side of West Pond Road. Line C is a location where both the Hanchuruck and the Bragg maps are in agreement as to the location of the boundary line.
Line D forms the southerly bound of the disputed area. It runs in an easterly direction from Line A following a two strand barb wire fence on posts and trees, passing through a fence post, as shown on Fisher's map, and extending further into Fischbach property where it terminates in the remains of a light gauge box wire fence running north and south. Line E is part of the easterly boundary of the disputed area. It starts at the fence post to which reference is made in the description of Line D and runs northerly 310 feet to the remains of a light gauge box wire fence. The fence post, according to Fisher's testimony and report, does not have characteristics of a corner post meaning an absence of bracing from other wood nailed into it and an absence of wrapped around wire. The only physical evidence of a boundary found along Line E by Fisher is what he described as a small pile of stones and which is designated as a cairn on the Hanchuruck and Bragg maps.
Line F is a continuation of Line E following a light gauge box CT Page 1412-XX wire fence about 90 feet to a point where the box wire meets the remains of a stone wall and the remains of a barb and box wire fence. Then Line F runs easterly following said stone wall for over 100 feet in undisputed Fischbach property. Line G starts where Line F first meets the stone wall and proceeds westerly approximately 80 feet along the remains of a barb wire fence to a tree half way up a steep slope in a gap in the cliff. Line H runs northerly from said tree along the top of the cliff about 170 feet to a stump with barb wire in it. Along Line H, Fisher found no physical evidence of a boundary line. Line I follows the remains of a barb wire fence running northwesterly from said stump about 40 feet to a second stump which is the point of intersection of Lines B and C approximately 30 feet from the south side of West Pond Road.
As heretofore mentioned, Line J is on interior line running through a portion of the disputed area. It was drawn by Fisher to follow what appeared to him to be newer strands of wire on trees from Line A for about 110 feet to the base of the cliff.
In comparing the survey maps to the deeds, the boundary line between the plaintiff and the defendants shown as the eastern line on the Hanchuruck survey with its jogs totals 1,313.21 feet. The distance of the almost straight westerly line on the Bragg map is 1,148.67 feet. In the deeds from Mary Abt to John Wittmer and from John Wittmer to the plaintiff's father on October 29, 1949, the footage in the common boundary between Apt and Schwidtal is not stated. In the deed from George Schwidtal to Lawrence and Eva Marjan dated September 15, 1948, the footage is given for the common boundary is 1,100 feet more or less.
Chester Lane, a title searcher for 42 years testified that the descriptions of the Abt-Schwidtal common boundary in both chains of title appeared to be of a straight line. The scrivener of the deed from George Schwidtal to the Marjans apparently knew how to describe a jog when such a description was appropriate as evidenced by the "Easterly again" and "Southerly again" boundary descriptions in the Schwidtal-Marjan deed.
In addition to the foregoing, there are some further findings of fact. They appear in the next section of this memorandum.
 II.
All actions to quiet title are governed by § 47-31 the CT Page 1412-YY provisions of which are mandatory. DeVita v. Esposito, 13 Conn. App. 101,103-04 (1987), cert. denied 207 Conn. 807 (1988);Fanfesti v. Englehardt, 27 Conn. Sup. 349, 352 (1967). The statute requires that the complaint describe the property in question, state the plaintiff's title therein and the manner in which such title was acquired. Each defendant who makes a claim adverse to the plaintiff must set out "the manner in which and the sources through which" his contrary claim was acquired. Dawson v. Orange,78 Conn. 96, 121 (1905). The court has to determine the exact status of the land and its judgment must set forth the rights of the parties in it. Spelke v. Shaw, 114 Conn. 272, 283 (1932). To obtain an adjudication of title, however, a party must do so on the strength of his own title as distinguished from weakness in the titles of his adversaries. Marguis v. Drost, 155 Conn. 327, 334
(1967).
Some general principles provide starting points for discussion. The deeds from John Wittmer to the plaintiff's father and the deed from George Schwidtal to Lawrence and Eva Marjan being more than thirty years old are "ancient deeds. Borden v.Westport, 112 Conn. 152 (1930). Under the circumstances of this case, such deeds proved themselves. A basic rule of construction is that recognition will be given to the intention of the parties as expressed in a deed and if possible the deed will be construed to effectuate that intention. Faiola v. Faiola, 156 Conn. 12, 17
(1968). Another rule of construction is that where descriptions are contradictory or uncertain known and fixed monuments will control courses and distances. Russo v. Corideo, 102 Conn. 663,672 (1925). Most monuments are either natural or artificial tangible objects but a parcel of land itself may be a monument to determine the boundary and limit of another's land. Raymond v.Nash, 57 Conn. 447, 453 (1899).
Of course in this case the cited general principles have only limited utility. There is no dispute that from the deeds the western boundary of the plaintiff's land is the easterly boundary of the defendants' property. The question is the location of that boundary. Other than abutting owners the deeds contain no mention of monuments. The intention of the parties must be determined, however, and this search requires consideration of the deeds, declarations and surveys that have been placed in evidence.
As heretofore mentioned, the plaintiff has the burden of proving that the common boundary is where he claims it to be. LaFreniere v. Gallinas, 148 Conn. 660, 665 (1961). In this regard, CT Page 1412-ZZ the court was impressed with the testimony of the title searcher Chester Lane who, from the description in the deeds preceding and to the plaintiff's father and in the deed from Schwidtal to the Marjans, opined that the common boundary was intended to be a straight line. Lane's opinion was derived from the absence of jogs in the deeds of the plaintiff's predecessors and, more important, the mention of jogs in the Schwidtal to Marjan deed for boundaries with other land of the grantor and not the boundary at issue. In the ascertainment of the person's intent, a court may consider the circumstances surrounding the transaction at the time of the conveyance. Lake Garda Improvement Ass'n. v. Battistoni, 160 Conn. 503,513 (1971).
Many of the facts found in the previous section were developed from the testimony of the surveyor Warren Fisher. The court walked, the western line of the disputed area next to Warren Fisher and the easterly line, as developed in the Hanchuruck survey, next to Stephen Hanchuruck. The presence of many strands of old wire embedded in trees and the remains of a stone wall Fisher's Lines A, B and C, is found to constitute persuasive evidence of boundary activity. On the easterly line there was a paucity of monuments. Mr. Hanchuruck was able to point only to the pile of stones that he and Bragg on their maps have identified as a cairn.
The epitome of the dispute concerns which of the two surveyor's maps portrays the common boundary more accurately. But along with that question, there is an underlying issue of whether the information depicted on the maps is reliable. The parties have briefed the two questions thoroughly. Since each surveyor developed a "common" line while under the express direction of his client, the question of reliability should be governed by the law concerning "declarations as to boundaries." The leading case isTurgeon v. Woodward, 83 Conn. 537 (1910) whose continued vitality is shown by such later decisions as Wildwood Associates, Ltd. v.Esposito, 211 Conn. 36 (1989) and DiMaggio v. Cannon, 165 Conn. 19
(1973).
In Turgeon v. Woodward, supra at 540 et seq., our Supreme Court explained that "a [an out-of-court] declaration as to boundaries between individual proprietors is hearsay, but it is one of the recognized exceptions to the hearsay rule whenever the legal conditions of its admission are present." To make such a declaration the equivalent in reliability and trustworthiness to testimony that is subject to cross examination, four prerequisites exist as conditions precedent to its admission (1) The declaration CT Page 1412-AAA must be one from a dead person. (2) The declarant must be shown to be a witness qualified to testify if he had been present and especially that he had peculiar means of knowing the boundary. (3) The declaration must have been made before the controversy which is the subject of the trial wherein the declaration is offered arose, (4) The declarant must have had no interest to misrepresent when the declaration was made. The phrase "no interest to misrepresent" means freedom from selfish motive or self-interest or personal advantage; disinterested not merely in the sense of having no pecuniary interest, but in the broader sense of being absolutely impartial and indifferent to the controversy that is being tried.Id. at 542; Wildwood Associates, Ltd. v. Esposito, supra at 44;DiMaggio v. Cannon, supra at 22-23.
Of the four preconditions, the court concludes that the first three were satisfied but the fourth was not. The declarant Lawrence Marjan had a direct pecuniary interest in the location of the boundary in that he hired Hanchuruck to prepare a survey map in order to facilitate the sale of his property. Further, bothTurgeon, supra at 542 and Wildwood Associates, supra at 44 contain the following statements: "From earliest times we have excluded the declaration of the deceased owner of land as to his own boundary for the reason that he was interested and so the source of his title would forbid confidence to be placed in it. . . . For like reason, we have held similar declarations of one from whom the claimant derives title to be inadmissible." Wildwood Associates,supra at 44, states that a declaration's inadmissibility because of a declarant's former ownership is a matter of law although a reading of Turgeon, supra at 549, the earlier case of Smith v.Martin, 17 Conn. 399, 400 (1845) (deceased landlowner's [landowner's] declarations admissible if against interest) and DiMaggio, supra at 23-24 seemingly make impartiality and disinterest questions of fact.
Contrary to the defendants' suggestion, the factual setting of this case is not at all like Rompe v. King, 185 Conn. 426 (1981) upon which they rely. In Rompe, three maps prepared by a surveyor who had been engaged by the plaintiffs' predecessor in title and who was deceased at the time of trial were admitted over the defendant's hearsay objections. The surveyor was found to be a disinterested person and the dimensions in the deed by which the plaintiffs received title. The other two maps were of the predecessor's entire property, and had been filed in the Branford town clerk's office. They were held to be admissible under General CT Page 1412-BBB Statutes § 7-31. Section 7-31 has been around a long time. It refers to the plotting of lots and projections of highways and to rights acquired by grantees in areas designated as public upon the filing of maps, see Aunt Hack Ridge Estates, Inc. v. PlanningCommission, 160 Conn. 109, 116 (1970); Peterson v. Ramcke,140 Conn. 202, 208 (1953). Section 7-31 is of little or no significance in a boundary dispute between abutting landowners. More to the point, however, is the difference between the activity of the surveyor in Rompe and that of Hanchuruck in this case. Instead of working with of from a deed, Hanchuruck's primary sources for the boundary were the monuments that were chosen by Lawrence Marjan when they walked around together. A case, parallel to this one, is Mentz v. Greenwich, 118 Conn. 137, 144-46 (1934) where evidence of a deceased landowner's declarations to a surveyor concerning land boundaries made during a survey preparatory to a conveyance to the declarant's daughter was ruled inadmissible for the purpose of establishing the boundaries of the land conveyed.
Little has to be said about the defendants' contentions that the plaintiff has not proven possession or at most has proven naked title. It is true that a mere paper chain of title does not establish ownership in a person unless his possession or that of his predecessors in title is shown. Mentz v. Greenwich, supra at 143. But a person who claims title by deed is claiming a good; record title that entitles him, in an action to quiet title, to a judgment of ownership. Title, satisfactorily established, draws with it the right to possession in the absence of contrary evidence. Id.; DeVita v. Esposito, supra at 107.
Since Lawrence Marjan's declarations concerning boundary markers constituted inadmissible hearsay, the Hanchuruck map is an unreliable indicator of where the common boundary lies. On the other hand, the evidence offered by the plaintiff was not so hampered. The plaintiff's testimony met and passed "the test of the greatest ally of the truth — a cross examination". Turgeon v.Woodward, supra at 540. The map prepared by David Bragg[1] is substantially more consistent with the deeds to Ferdinand Fischbach and Lawrence and Eva Marjan then is the map of Hanchuruck. SeeVelsmid v. Nelson, 175 Conn. 221, 227 (1978). And the testimony of Warren Fisher as well as that of the plaintiff himself establishes circumstantially that the plaintiff's predecessors possessed the area in dispute. See Pepe v. Aceto, 119 Conn. 282, 286 (1934). On the strength of his own title, the plaintiff has proven his right to a judgment of ownership. Conversely, the defendants have not.[2]Loewenberg v. Wallace, 147 Conn. 689, 698-99 (1960). CT Page 1412-CCC
 III.
In compliance with § 47-31(f) the court determines that the common boundary between the plaintiff Gerald Fischbach and the defendants Anthony and Dorothy Walker is the line designated as Line A, Line B and Line C, as shown on the map prepared by Warren Fisher d/b/a LWF Land Surveying, dated May 29, 1992, and also shown as the west boundary of Fischbach's land, including the west boundary of the area designated "Disputed Property", on the map prepared for Gerald Fischbach by David R. Bragg Associates, dated; June 8, 1990. Said line on the aforesaid Bragg map is more; particularly described as follows:
Commencing at the Southwesterly corner of the Fischbach property, thence along a common boundary N 01° 12' 53" W, 51.83 feet;
Thence N 11° 03' 03" W, 74.04 feet;
Thence N 06° 48' 50" W, 53.22 feet;
Thence N 16° 39' 40" W, 121.87 feet;
Thence N 11° 29' 30" W, 88.98 feet;
Thence N 13° 14' 20" W, 86.20 feet;
Thence N 06° 50' 34" W, 43.59 feet;
Thence N 23° 03' 27" W, 45.38 feet;
Thence N 15° 32' 09" W, 49.59 feet;
Thence N 21° 36' 34" W, 50.20 feet;
Thence N 24° 51' 14" W, 96.29 feet;
Thence N 09° 32' 29" W, 237.98 feet;
Thence N 40° 13' 46" W, 28.72 feet to the point in the Southerly line of West Pond Road, all as is shown on a map dated June 8, 1990 by David R. Bragg Associates entitled "Property Map prepared for Gerald Fischbach, 50 West Pond Road, North Branford, CT." CT Page 1412-DDD
Jerrold H. Barnett, Judge